**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1993**

---

D.B., as next friend of R.M.B., a minor,

Petitioner – Appellant,

v.

BRENT CARDALL, Chief Probation Officer, Yolo County Juvenile Detention Facility; ROBERT CAREY, Director, Office of Refugee Resettlement, U.S. Department of Health and Human Services, in his official capacity; SYLVIA MATHEWS BURWELL, Secretary, Department of Health and Human Services, in her official capacity,

Respondents – Appellees.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:15-cv-00745-JCC)

---

Argued: March 22, 2016                    Decided: June 20, 2016

---

Before KING, AGEE, and FLOYD, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the majority opinion, in which Judge Agee joined. Judge Floyd wrote a dissenting opinion.

---

**ARGUED:** Susan Leigh Watson, TEXAS RIOGRANDE LEGAL AID, INC., Nashville, Tennessee, for Appellant. Katherine Elizabeth Mallo Goettel, UNITED STATES DEPARTMENT OF JUSTICE, Chicago, Illinois, for Appellees. **ON BRIEF:** Catherine Norris, TEXAS RIOGRANDE LEGAL AID, INC., San Antonio, Texas; Simon Sandoval-Moshenberg, LEGAL AID JUSTICE CENTER, Falls Church, Virginia, for Appellant.

Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Leon Fresco, Deputy Assistant Attorney General, Civil Division, William C. Peachey, Director, Elizabeth J. Stevens, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, Dennis Barghaan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

———————————

KING, Circuit Judge:

Dora Beltrán — also referred to as D.B. — appeals the district court's denial of her petition for a writ of habeas corpus, seeking relief as next friend of R.M.B., her minor son. R.M.B., a native of Guatemala, is being held as an unaccompanied alien child (a "UAC") by the Office of Refugee Resettlement (the "Office"), an agency of the Department of Health and Human Services (the "DHHS"). The Office has declined to release R.M.B. to his mother because it deems her incapable of providing for his physical and mental well-being. Beltrán maintains that the Office lacks statutory authority to detain R.M.B., and that his detention also contravenes substantive and procedural due process. By decision of August 5, 2015, the district court rejected Beltrán's statutory and constitutional claims and denied her request for habeas corpus relief. See D.B. v. Poston, 119 F. Supp. 3d 472 (E.D. Va. 2015) (the "Opinion"). As explained below, we affirm in part, vacate in part, and remand.

I.

A.

We draw the pertinent facts with respect to this proceeding from the district court's Opinion and other aspects of the

record.[1]  R.M.B. was born in Guatemala in February 1999.  In 2005, at the age of six, he left Guatemala with his mother and three siblings and illegally entered the United States.  Beltrán and her children settled in Rio Bravo, Texas, near the Mexican border.  Soon thereafter, Beltrán married a man who was either a citizen or a lawful permanent resident of this country.

Because Beltrán's husband physically abused her on a regular basis, she filed a petition with the U.S. Citizenship and Immigration Services (the "USCIS"), seeking classification as the spouse of an abusive citizen or lawful permanent resident — a type of relief authorized by the Violence Against Women Act (the "VAWA").  Beltrán's VAWA petition was approved by the USCIS in September 2012.  In February 2013, the USCIS granted deferred action to R.M.B. as a derivative beneficiary of his mother's VAWA petition.  See J.A. 25-26 (explaining that deferred action "is an administrative choice to give some cases lower priority for removal," and that the USCIS did not then anticipate

_____

[1] In its Opinion, the district court referred to Beltrán only by her initials, D.B., citing concerns about "the sensitive nature of the issues involved in this proceeding."  See D.B., 119 F. Supp. 3d at 474 n.1.  Consistent with the complaint and notice of appeal, as well as the appellate briefs, we refer to Beltrán by name.

4

pursuing removal proceedings against R.M.B.).[2]   According to Beltrán, she was thereafter granted an adjustment of status by the USCIS and became a lawful permanent resident.   R.M.B.'s immigration status, however, was never adjusted.   On May 6, 2015, his deferred action was extended through April 6, 2016.

R.M.B has had a difficult upbringing.   For example, he witnessed his step-father physically abusing his mother on multiple occasions.   In December 2012, the State of Texas removed Beltrán's children from her custody after she left them at home alone.   Five months later, in May 2013, a Texas court restored custody to Beltrán.

R.M.B. exhibited serious behavioral problems while the family lived in Rio Bravo.   During the period from 2011 to 2013, he was arrested on multiple occasions.   In July 2012, he was found guilty by a state juvenile court of making a terroristic threat and placed on probation.   He also ran away from home several times.   R.M.B. used alcohol and tobacco at ten or eleven years of age, marijuana by twelve, and hard drugs by fourteen. R.M.B. has admitted being involved with gangs, as well as smuggling drugs and immigrants across the Mexican border.   He

---

[2] Citations herein to "J.A. __" and "J.A.S. __" refer to the contents of the Joint Appendix and the Sealed Joint Appendix filed by the parties in this appeal.

advised a psychologist that he has carried a gun and on one occasion shot and killed a man.

Hoping that a new environment would improve R.M.B.'s behavior, Beltrán moved her family in July 2013 about 160 miles from Rio Bravo to Corpus Christi, Texas. In approximately October 2013, however, R.M.B. (then fourteen years old) ran away from their Corpus Christi home and returned to Rio Bravo, where he found a job smuggling undocumented immigrants from the Mexican border to McAllen, Texas.

On December 15, 2013, Border Patrol agents arrested R.M.B. in Rio Grande City, Texas, near the Mexican border. R.M.B. told one of the agents that he was waiting to pick up a group of undocumented immigrants. The agent allowed R.M.B. to call his mother, who told him to "remind the agent that he had VAWA." See J.A. 71. According to the agent, R.M.B. "displayed a bad attitude towards his mother over the phone" and hung up on her. See J.A.S. 45. During the phone call, Beltrán also spoke with the Border Patrol agent, advising him that she and R.M.B. "had VAWA and that we were filling out the papers and doing the other things we needed to do to become permanent residents." See J.A. 71. Beltrán emphasized that she "had immigration papers that would prove all of this." Id. The agent directed Beltrán to look for her papers and said he would call back in about fifteen minutes. Beltrán found the papers, got in her car, and began

6

driving from Corpus Christi to Rio Grande City. She had driven thirty or forty miles when the Border Patrol agent called back. The agent told Beltrán to return home because the Border Patrol had decided to detain R.M.B. and send him to a youth shelter. When Beltrán insisted that she had the appropriate papers, the Border Patrol agent threatened to arrest her if she showed up. As a result, Beltrán returned to Corpus Christi.

Shortly after R.M.B.'s December 15, 2013 arrest, the Border Patrol decided that he was a UAC. The relevant statute underlying that determination, found at § 279 of Title 6, defines a UAC as a child who:

> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom —
>
>> (i) there is no parent or legal guardian in the United States; or
>>
>> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

See 6 U.S.C. § 279(g)(2) (the "UAC definition"). Pursuant to its UAC finding, the Border Patrol transferred R.M.B.'s custody to the Office — as the agency responsible for providing care and custody of all UACs — and initiated removal proceedings against him.

7

Since his transfer to the Office's custody in late 2013, R.M.B. has been housed in seven different care provider facilities in five states. While in the Office's custody, R.M.B.'s behavioral problems have continued. He has, for example, fought with facility employees and residents and engaged in sexually aggressive behavior toward staff members. R.M.B. has also exhibited self-harming behavior and expressed suicidal thoughts. On one occasion, he briefly escaped from the Office's custody by kicking out the window of a transport van.

In about January 2014, Beltrán submitted a family reunification request to the Office, asking for R.M.B.'s release to her custody. The Office promptly ordered a home study, after determining that one was necessary to properly evaluate Beltrán's reunification request. The home study recommended against releasing R.M.B. to Beltrán, concluding that her home did "not appear to be a safe and stable environment by evidence of [Beltrán's] abusive relationship with her spouse." See J.A.S. 68. R.M.B., the home study related, had "an extensive history of substance abuse and criminal history" and posed "a high risk of recidivism." Id. The home study also observed that Beltrán was unable to provide a safety plan for R.M.B.

Consistent with those recommendations, the Office, by letter of March 12, 2014, denied Beltrán's family reunification request. The denial letter explained that, prior to releasing a

8

UAC, the Office must "determine that the proposed custodian is capable of providing for the [UAC's] physical and mental well-being." See J.A.S. 88. That obligation arises from a statute which provides, in relevant part, that a UAC "may not be placed with a person or entity unless the [DHHS Secretary] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." See 8 U.S.C. § 1232(c)(3)(A) (the "suitable custodian requirement").

The Office's letter gave two reasons for denying Beltrán's family reunification request: that R.M.B. "requires an environment with a high level of supervision and structure"; and that, based on the home study, "it does not appear . . . that your home can provide the structure and supervision necessary for the safety of your son." See J.A.S. 88. The denial letter also advised Beltrán that she could seek reconsideration of the Office's decision by submitting a request within thirty days to the DHHS Assistant Secretary for Children and Families, Mark Greenberg.[3]

On March 11, 2015, Beltrán sent a request for reconsideration to the Office, asserting that R.M.B.'s

---

[3] The Assistant Secretary for Children and Families supervises the Administration for Children and Families, which is an operating division of the DHHS. The Office, in turn, is within the Administration for Children and Families.

9

continuing detention was unlawful and demanding his release. Subsequently, on April 15, 2015, R.M.B. appeared in immigration court for the first time since his removal proceedings had been instituted. The immigration judge terminated the removal proceedings against R.M.B. because he had already been granted deferred action.

B.

On June 12, 2015, Beltrán, as R.M.B.'s next friend, filed her petition for habeas corpus in the Eastern District of Virginia, pursuant to 28 U.S.C. § 2241. The petition named three respondents: Darryl Poston, Director of the Northern Virginia Juvenile Detention Facility, where R.M.B. was being housed; Office Director Robert Carey; and DHHS Secretary Sylvia Burwell. On June 17, 2015, in accordance with 28 U.S.C. § 2243, the district court ordered that the petition be served on the respondents and directed them to show cause why a writ should not issue.[4]

---

[4] Section 2243 of Title 28 establishes generally applicable procedures for habeas corpus proceedings. Under § 2243, a district court with jurisdiction over a habeas corpus petition "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted," unless the petition lacks merit on its face. The respondent "shall make a return certifying the true cause of the detention."

10

On July 10, 2015 — after Beltrán filed her habeas corpus petition — Assistant Secretary Greenberg denied Beltrán's request for reconsideration. Greenberg's letter explained that he agreed with the Office's conclusion that R.M.B. "should not be released due to the concerns and necessity to provide structure and supervision given your son's needs and welfare." See J.A.S. 90. In support of that conclusion, the letter relied, inter alia, on a May 25, 2015 psychosexual risk assessment, which concluded that R.M.B. "appears to be a Moderate-Risk to continue engaging in sexual offending behaviors and a Moderate-High Risk to continue engaging in non-sexual offenses." Id. at 85. The July 10 letter also rejected Beltrán's contention that, because she had been available to take custody of R.M.B. when the Border Patrol detained him, R.M.B. failed to satisfy the UAC definition.

On July 17, 2015, the government filed its response to Beltrán's habeas corpus petition, urging the district court to deny it. The government submitted several exhibits in support of its response, including (under seal) the home study report, the psychosexual risk assessment, and a psychological evaluation dated June 15, 2014.

C.

On August 5, 2015, the district court denied Beltrán's habeas corpus petition for the reasons explained in its Opinion.

11

The Opinion began by reciting "findings of fact" that the court deemed undisputed and predicated on the record, "unless otherwise noted." See D.B., 119 F. Supp. 3d at 474. The Opinion observed that there was "no motion currently pending before" the court, but that the parties had submitted "sworn affidavits and documentary evidence in favor of their respective positions," and that each party had requested a "summary disposition" of the petition. Id. at 474 n.2. Accordingly, the Opinion explained that the court would make findings of fact after considering "the material in the record and the oral argument of counsel, just as it would if the matter were before the Court on summary judgment." Id.[5]

1.

The district court first addressed Beltrán's statutory contentions, beginning with the assertion that the Office lacked authority to detain R.M.B. because he did not satisfy the UAC definition. The Opinion explained that it was uncontested that R.M.B. satisfies the first two elements of that definition, in

_____

[5] Although the district court referred to making "findings of fact" as if on "summary judgment," it appears that the parties agreed to a proceeding more akin to a summary bench trial, as contemplated by 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."). We view the Opinion and its factual recitation in that light, reviewing the facts recited therein for clear error and the legal rulings de novo. See Billings v. Polk, 441 F.3d 238, 243 (4th Cir. 2006).

12

that he has no lawful immigration status and has not yet attained eighteen years of age. Only the third element — whether, "as initially decided by" the Border Patrol, R.M.B. has "no parent or legal guardian in the United States available to provide care and physical custody" — was at issue. See D.B., 119 F. Supp. 3d at 480; see also 6 U.S.C. § 279(g)(2)(C)(ii). The Opinion then recognized that the Border Patrol agents "determined, within their discretion, that [he] met the definition of a UAC." See D.B., 119 F. Supp. 3d at 482.

The Opinion ruled that Beltrán's disagreement with the Border Patrol's UAC determination was "not cognizable for habeas relief," because § 2241 "is not the proper vehicle to challenge discretionary federal agency action." See D.B., 119 F. Supp. 3d at 482. The Opinion also concluded that, "once R.M.B. was classified as a UAC by [Border Patrol] field officers," the Office had no authority to release him to anyone unless it first determined, under the suitable custodian requirement, that the proposed custodian was capable of providing for R.M.B.'s physical and mental well-being. Id. at 483 (citing 8 U.S.C. § 1232(c)(3)(A)).

The district court next addressed and rejected Beltrán's position that the Office lost custodial authority over R.M.B. when his removal proceedings terminated. In that regard, the Opinion observed that Beltrán's argument relied "on a false

13

premise, i.e., that R.M.B. is in 'immigration detention.'" See D.B., 119 F. Supp. 3d at 485. The Opinion also reiterated that the Office was precluded by statute from releasing R.M.B. to anyone unless it first determined that the proposed new custodian was capable of providing for his physical and mental well-being.

2.

Having rejected Beltrán's statutory claims, the district court addressed and also rejected her substantive and procedural due process claims, "in light of the Supreme Court's holding in Reno v. Flores, 507 U.S. 292 (1993)." See D.B., 119 F. Supp. 3d at 486. As the Opinion explained, Flores involved a challenge to a regulation of the Immigration and Naturalization Service (the "INS") providing for the release of juvenile aliens, detained on suspicion of deportability, "only to their parents, close relatives, or legal guardians, except in unusual and compelling circumstances." Id. (citing Flores, 507 U.S. at 294-99). The Flores plaintiffs had contended that the INS regulation facially contravened both substantive and procedural due process. The Supreme Court readily rejected the substantive due process challenge, ruling that an alien child with no available parent, guardian, or close relative was not constitutionally entitled to be released to the custody of an unrelated adult, rather than placed in a childcare institution

14

selected or operated by the government.  See Flores, 507 U.S. at 304-05.

In its Opinion, the district court acknowledged that R.M.B.'s case is distinguishable from Flores, in that Beltrán is seeking the release of her own son — not an unrelated child — and contends she is available to take custody of R.M.B.  See D.B., 119 F. Supp. 3d at 487.  The Opinion underscored, however, that the authorities had determined, in their discretion "and either rightly or wrongly, but in accordance with statute, that R.M.B. is an alien child that has no available parent."  Id. Accordingly, the Opinion characterized the "right at issue" as

> the alleged right of an alien child who has no available parent, close relative, or legal guardian, as determined by the federal government, and for whom the government is responsible, to nonetheless be placed in the custody of his parent, who cannot, at this time, properly care for his mental and physical needs.

Id.  The Opinion then determined that the alleged right was not a fundamental one, that the Border Patrol's UAC determination was rational, and thus that no deprivation of substantive due process had occurred.  See id.

Turning to Beltrán's procedural due process claim, the Opinion explained that, in Flores, the Supreme Court "held that the juvenile aliens' demand for an individualized custody hearing was merely the 'substantive due process' argument recast in procedural terms," and "found that due process was satisfied

15

by giving the detained alien juveniles the right to a hearing before an immigration judge." See D.B., 119 F. Supp. 3d at 487 (citing Flores, 507 U.S. at 307-09). The Opinion reasoned that "R.M.B. was afforded the same right to a hearing before an immigration judge, where his immigration proceedings were terminated." Id. Finally, the Opinion ruled that the mechanism in place for seeking family reunification provided sufficient procedural safeguards to "satisf[y] any constitutional scrutiny." Id. at 488. Accordingly, the district court denied Beltrán's habeas corpus petition.

On August 27, 2015, Beltrán noted this appeal from the district court's judgment. We possess jurisdiction pursuant to 28 U.S.C. § 1291.[6]

II.

In addition to Beltrán's statutory and constitutional contentions, this appeal presents issues concerning jurisdiction and the proper scope of review under 28 U.S.C. § 2241. The

---

[6] On September 3, 2015, while this appeal was pending, the government moved for leave to transfer R.M.B. from Virginia to a facility in California, pursuant to Rule 23 of the Federal Rules of Appellate Procedure. On September 23, 2015, over Beltrán's objection, we granted the government's motion to transfer. R.M.B. thereafter was moved to California, where he is presently detained. In accordance with Rule 23(a), we have substituted R.M.B.'s current custodian, Brent Cardall, for Darryl Poston as the lead respondent in this appeal.

16

government maintains that Beltrán's petition sought judicial review of discretionary and factual decisions of administrative agencies — in particular, the Border Patrol's initial determination that R.M.B. was a UAC and the Office's denial of family reunification — that are not subject to challenge by way of habeas corpus. Beltrán answers that her contentions involve questions of statutory interpretation and constitutional rights that are cognizable under § 2241. Specifically, she maintains that R.M.B. is not a UAC as a matter of federal law, that the Office lacks statutory authority to detain UACs after their immigration proceedings have terminated, and that R.M.B.'s continuing detention contravenes substantive and procedural due process.

Section 2241 of Title 28, the general habeas corpus statute, provides that habeas corpus relief can extend to several classes of persons, including those "in custody under or by color of the authority of the United States" and those "in custody in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C. § 2241(c)(1), (3). It is undisputed that R.M.B. is "in custody" under the authority of the United States. Moreover, Beltrán's petition alleges that R.M.B.'s custody is in violation of federal statutes and the Constitution. Accordingly, we are satisfied that subject matter jurisdiction exists with respect to Beltrán's § 2241 petition.

17

We are also of the view that the issues pursued by Beltrán, on behalf of her son, are properly within the scope of this habeas corpus proceeding. Beltrán contends that the Office is holding R.M.B. pursuant to "the erroneous application or interpretation" of applicable statutes. See Boumediene v. Bush, 553 U.S. 723, 779 (2008) (internal quotation marks omitted) (observing that it is "uncontroversial" that such statutory claims are cognizable in habeas corpus proceedings). She also maintains that her son's detention contravenes the Fifth Amendment's Due Process Clause. See Fay v. Noia, 372 U.S. 391, 402 (1963) ("[T]here is nothing novel in the fact that today habeas corpus in the federal courts provides a mode for the redress of denials of due process of law."), overruled in part on other grounds by Wainwright v. Sykes, 433 U.S. 72 (1977). Beltrán's contentions therefore fall within the traditional scope of § 2241 habeas corpus review.[7]

---

[7] The vast majority of federal habeas corpus proceedings are pursued under 28 U.S.C. § 2254 by state prisoners seeking post-conviction relief on the ground that their custody violates the Constitution or federal law. As one of our sister circuits has explained, § 2254 does not create an independent remedy apart from § 2241, but merely imposes "a limitation on the preexisting authority under § 2241(c)(3) to grant the writ of habeas corpus to state prisoners." See Medberry v. Crosby, 351 F.3d 1049, 1060 (11th Cir. 2003). Federal prisoners, by contrast, are afforded a remedy separate and apart from habeas corpus under § 2241 — a motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct a sentence. Although the § 2255 remedy is not considered a habeas corpus proceeding, see Medberry, 351 F.3d at (Continued)

18

III.

Being satisfied that we possess jurisdiction, we first proceed to the merits of Beltrán's statutory contentions. We review the district court's factual findings for clear error and its legal conclusions de novo. See supra note 5 (citing Billings v. Polk, 441 F.3d 238, 243 (4th Cir. 2006)).

A.

The care and custody of UACs by the government is governed by a legal framework consisting primarily of two statutory provisions — § 279 of Title 6 and § 1232 of Title 8 — plus a settlement agreement that is binding on the pertinent federal agencies. At the outset of our discussion, we identify relevant aspects of that framework, as well as some historical context.

1.

Prior to 2003, the INS was charged with the care and custody of alien children who were arrested in this country on suspicion of being deportable, and who had no responsible parent or legal guardian. The INS, an arm of the Department of

_____

1057, the standards governing § 2255 motions are similar to those established in § 2254. A federal prisoner may seek habeas corpus relief pursuant to § 2241 only if "the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." See 28 U.S.C. § 2255(e). Put succinctly, neither § 2254 nor § 2255 applies to this proceeding, because R.M.B. is neither in custody pursuant to a state court judgment nor serving a sentence imposed by a federal court.

19

Justice, was also responsible for prosecuting removal proceedings against such children in the immigration courts.

In 1985, several juvenile aliens in INS custody initiated a class action in the Central District of California challenging INS policies regarding the detention of alien children. That litigation wound its way through the federal court system — including the Supreme Court, see Reno v. Flores, 507 U.S. 292 (1993) — for twelve years before the parties entered into a court-approved settlement agreement in 1997 (the "Flores Agreement"). The Flores Agreement established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." See Flores Agreement ¶ 9. The Agreement is binding on all successor agencies to the INS, including the Office — subject, of course, to changes in the applicable statutes.[8]

The Flores Agreement spells out a general policy favoring less restrictive placements of alien children (rather than more restrictive ones) and their release (rather than detention). The Agreement contemplates that, unless detention is necessary

---

[8] The Office recognizes its continuing obligations under the Flores Agreement. See Office of Refugee Resettlement, ORR Guide to Children Entering the United States Unaccompanied § 3.3 (2015), http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.3 (outlining obligations imposed by Flores Agreement on Office's care provider facilities).

to ensure a child's safety or his appearance in immigration court, he must be released "without unnecessary delay," preferably to a parent or legal guardian. See Flores Agreement ¶ 14. The appropriate agency may, however, require a "positive suitability assessment" before releasing the child to the custody of any individual or program. Id. ¶ 17.

The Flores Agreement specifies that, when an alien child is not released, he ordinarily should "be placed temporarily in a licensed program until such time as release can be effected . . . or until [his] immigration proceedings are concluded, whichever occurs earlier." See Flores Agreement ¶ 19. The child may be detained in a secure facility only under specified limited circumstances, and then only when no less restrictive alternative is "available and appropriate." Id. ¶¶ 21, 23.

2.

In November 2002, Congress and the President enacted the Homeland Security Act (the "HSA"), which "brought under a single umbrella" most of the federal agencies responsible for securing the border and administering the immigration laws. See Tabbaa v. Chertoff, 509 F.3d 89, 92 (2d Cir. 2007). The HSA abolished the INS and transferred most of its functions to agencies within the newly created Department of Homeland Security (the "DHS"), including the Border Patrol. The HSA carved out of that general transfer to the DHS the "functions under the immigration laws

21

. . . with respect to the care of [UACs] that were vested by statute in, or performed by, the [INS]." See 6 U.S.C. § 279(a). All functions with respect to the care and custody of UACs were transferred instead to the Office, as an agency of the DHHS. Id.

The HSA also created the UAC definition. See 6 U.S.C. § 279(g)(2). First, to qualify as a UAC, an individual must have "no lawful immigration status in the United States." Id. § 279(g)(2)(A). Second, the individual must be under the age of eighteen. See id. § 279(g)(2)(B). And third, the alien child must have either (i) "no parent or legal guardian in the United States"; or (ii) "no parent or legal guardian in the United States . . . available to provide care and physical custody." Id. § 279(g)(2)(C).

The functions transferred to the Office include making and implementing "placement determinations for all [UACs] who are in Federal custody by reason of their immigration status." See 6 U.S.C. § 279(b)(1)(A)-(E). In making such determinations, the Office is required to consult with juvenile justice professionals and relevant DHS officials, in order to ensure that UACs appear at immigration proceedings; that UACs are protected from "smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity"; and that UACs are not likely to pose a

22

danger to themselves or others. Id. § 279(b)(2)(A). Finally, although the Office is charged with the care, custody, and placement of UACs, the responsibility for making immigration benefit determinations — such as asylum, naturalization, and adjustment of status — rests with appropriate officials within the DHS, the Department of Justice, and the State Department. See id. § 279(c).

3.

In 2008, six years after the HSA was enacted, Congress modified the statutes concerning UACs by adoption of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "Wilberforce Act"). The provisions relating to UACs are found in § 235 of the Wilberforce Act, most of which are codified at 8 U.S.C. § 1232. Congress therein reiterated that responsibility for "the care and custody of all [UACs], including responsibility for their detention, where appropriate," rests with the DHHS Secretary. See 8 U.S.C. § 1232(b)(1). Any other federal agency holding a UAC is duty-bound to "transfer the custody of such child" to the Office "not later than 72 hours after determining that such child is" a UAC. Id. § 1232(b)(3).[9]

---

[9] The Wilberforce Act makes reference to responsibilities being vested in the DHHS Secretary, whereas the HSA refers to responsibilities being vested in the Office, which is part of (Continued)

23

The Wilberforce Act contained provisions governing the placement of UACs who are in the Office's custody. For example, the Office shall "promptly" place a UAC "in the least restrictive setting that is in the [UAC's] best interest," subject to the need to ensure the UAC's safety and timely appearance at immigration hearings. See 8 U.S.C. § 1232(c)(2)(A). The Office "shall not" place a UAC in a secure facility "absent a determination that the [UAC] poses a danger to self or others or has been charged with having committed a criminal offense." Id. In addition, the Office must review on a monthly basis any placement of a UAC in a secure facility. See id.

The Wilberforce Act also delineated when the Office can release a UAC to the custody of a third party. In particular, pursuant to the suitable custodian requirement, the Office "may not" place a UAC with a person or entity without first making "a determination that the proposed custodian is capable of providing for the [UAC's] physical and mental well-being." See 8 U.S.C. § 1232(c)(3)(A). Furthermore, "[b]efore placing the [UAC] with an individual," the Office must determine whether a

---

the DHHS. Neither Beltrán nor the government has suggested that this distinction has any impact on this appeal. As pertinent here, the term "DHHS Secretary" also means "the Office," and vice versa.

24

home study is necessary.  Id. § 1232(c)(3)(B).  Conducting a home study is mandatory in some circumstances, including for any UAC "whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child."  Id.

## B.

Beltrán's first statutory contention is that the Office lacks the authority to detain R.M.B. because, as a matter of law, he neither is nor has ever been a UAC.  Specifically, Beltrán contends that R.M.B. is not a UAC because she was and is "available to provide care and physical custody" to him within the meaning of the UAC definition.  See 6 U.S.C. § 279(g)(2)(C)(ii).  In particular, Beltrán insists that the term "available" simply means "easy or possible to get or use," and that the UAC definition thus does not include an assessment of a parent's fitness or suitability as a custodian.  See Br. of Appellant 19 (internal quotation marks omitted).

As always, "[t]he starting point for any issue of statutory interpretation . . . is the language of the statute itself." See United States v. Bly, 510 F.3d 453, 460 (4th Cir. 2007).  If "the language at issue has a plain and unambiguous meaning with regard to the particular dispute," that meaning controls.  Id. (internal quotation marks omitted).  Critically, the UAC definition does not refer, as Beltrán suggests, to a parent's availability in a general sense.  Rather, it asks whether a

25

parent is "available to provide care and physical custody." See 6 U.S.C. § 279(g)(2)(C)(ii) (emphasis added). The word "care" generally means "[t]he provision of what is necessary for the health, welfare, maintenance, and protection of someone or something." See The New Oxford American Dictionary 258 (8th ed. 2004). Consequently, to be "available to provide care" for a child, a parent must be available to provide what is necessary for the child's health, welfare, maintenance, and protection. And a parent who is not "capable of providing for the child's physical and mental well-being" — as mandated by the suitable custodian requirement of 8 U.S.C. § 1232(c)(3)(A) — is not available to provide what is necessary for the child's health, welfare, maintenance, and protection.

In these circumstances, we are unable to conclude as a matter of law that R.M.B. is not a UAC. The Office found, after conducting a home study and gathering other evidence, that Beltrán was incapable of providing for R.M.B.'s physical and mental well-being. In her reply brief, Beltrán insists that she is not seeking review of the Office's finding that she is not a suitable custodian, even though she "unequivocally disputes" that finding and contends that the procedures utilized to reach it were unfair. See Reply Br. of Appellant 27. Because the Office's unsuitability finding establishes that Beltrán is not available to provide care and physical custody of R.M.B., we

26

cannot say that R.M.B.'s detention is based on an erroneous application or interpretation of the UAC definition. We therefore reject Beltrán's first statutory contention.[10]

C.

Beltrán's second statutory contention is that the Office lacks authority to detain R.M.B. now that his immigration proceedings have terminated. Concomitantly, Beltrán asserts that the Flores Agreement bars the detention of R.M.B. by the Office upon termination of those proceedings. In response, the government maintains that the suitable custodian requirement precludes the Office from releasing a UAC to an unsuitable custodian even though the child's immigration proceedings have concluded. It also contends that, to the extent the Flores Agreement bars the detention of a UAC after his immigration proceedings have concluded, the Agreement was superseded in 2008 when the suitable custodian requirement was enacted.

---

[10] We need not address the propriety of the Border Patrol's initial UAC determination with respect to R.M.B. The question before the district court — and now before us — is whether R.M.B.'s current detention complies with federal statutes and the Constitution. Even if the Border Patrol incorrectly found R.M.B. to be a UAC, the Office's subsequent determination that Beltrán is not capable of providing for R.M.B.'s physical and mental well-being establishes her unavailability, and thus confirms R.M.B.'s present status as a UAC.

1.

Read in isolation, the suitable custodian requirement is clear:  a UAC "may not be placed with a person or entity unless the [Office] makes a determination that the proposed custodian is capable of providing for the [UAC's] physical and mental well-being."  See 8 U.S.C. § 1232(c)(3)(A).  Beltrán contends, however, that other parts of the statutory scheme, as well as the Flores Agreement, limit the authority of the Office over UACs to those involved in pending immigration proceedings.  She therefore maintains that the suitable custodian requirement is inapplicable to those UACs — such as R.M.B. — who are not involved in such proceedings.

Beltrán is correct that, as a general proposition, an alien may not be detained after his immigration proceedings have terminated.  See 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.").  The Flores Agreement also recognizes that, generally speaking, the detention of an alien child must end when immigration proceedings terminate.  See Flores Agreement ¶ 19 (providing that, if the INS does not release a minor, the minor "shall remain in INS legal custody . . . until such time as release can be effected . . . or until the minor's immigration proceedings are concluded, whichever occurs earlier").

28

As a rule of statutory construction, however, the specific terms of a statutory scheme govern the general ones.  See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012).  The general-specific rule is particularly applicable where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," id. (internal quotation marks omitted), as it has done in the immigration context.

Moreover, the general-specific rule is "perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission."  See RadLAX, 132 S. Ct. at 2071.  This proceeding presents such a contradiction.  On the one hand, 8 U.S.C. § 1226(a) confers general authority — on the Office with respect to UACs, and on the DHS otherwise — to detain aliens only during the pendency of immigration proceedings.[11]  On the other hand, the suitable custodian requirement imposes on the Office a

---

[11] By its terms, § 1226(a) of Title 8 lodges the power to detain aliens in the Attorney General, and not in either the Office or the DHS.  The HSA, however, transferred alien detention functions from the INS, an agency of the Department of Justice, to the Office for UACs, and to the Under Secretary for Border and Transportation Security within the DHS for aliens who are not UACs.  See 6 U.S.C. §§ 251(2), 279.  Pursuant to the HSA's savings provisions, the reference to the Attorney General in § 1226(a) with respect to the detention function must be "deemed to refer" to the appropriate officials of those transferee agencies.  See 6 U.S.C. §§ 279(e)(1), 552(d), 557.

29

specific prohibition against releasing UACs to unsuitable custodians. Thus, in order to "eliminate the contradiction," we are obliged to construe the suitable custodian requirement "as an exception to" the general rule that an alien's detention ends when his immigration proceedings are terminated. Id.[12]

2.

The general-specific rule of statutory construction, like other interpretive canons, can be overcome by sufficient indications of a contrary legislative intent. See S.C. Dep't of Health & Envt'l Control v. Commerce & Indus. Ins. Co., 372 F.3d 245, 258 (4th Cir. 2004). To overcome the presumption that a specific statutory provision controls a general one, Congress's contrary intent must be "clear." See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987). We employ the customary tools of construction to determine whether a clear intent exists, interpreting relevant statutory terms "not in a

---

[12] Beltrán contends that yet another canon of statutory construction — the presumption against implied repeals — requires us to read the suitable custodian requirement as limited by the existing restriction in 8 U.S.C. § 1226(a) on detention to the pendency of immigration proceedings. But the suitable custodian requirement did not repeal § 1226(a) by implication; it simply carved out an exception to its application. See Strawser v. Atkins, 290 F.3d 720, 733 (4th Cir. 2002) (rejecting repeal-by-implication argument where later statute "simply created a specific, discrete exception" to earlier one). Accordingly, we are satisfied that the presumption against implied repeals has no application in this matter.

vacuum, but with reference to the statutory context, structure, history, and purpose." See Abramski v. United States, 134 S. Ct. 2259, 2267 (2014) (internal quotation marks omitted).

a.

To support her contention that the suitable custodian requirement does not apply to a UAC who, like R.M.B., is not in immigration proceedings, Beltrán relies on a number of statutory provisions. First, she emphasizes provisions of the HSA defining the scope of the Office's authority, starting with its transfer from the INS to the Office of the "functions under the immigration laws . . . with respect to" UACs. See 6 U.S.C. § 279(a). Beltrán maintains that detaining alien children after the termination of immigration proceedings was never a function of the INS under the immigration laws. She also emphasizes that two of the duties transferred to the Office are defined in terms of UACs "who are in Federal custody by reason of their immigration status." Id. § 279(b)(1)(A), (C). Beltrán argues that the phrase "by reason of their immigration status" suggests that Congress understood that UACs would be detained only while their immigration proceedings were pending. Finally, Beltrán emphasizes the HSA's general savings provisions, codified at 6 U.S.C. § 552. Subsection (a) of § 552 provides, inter alia, that "completed administrative actions" — a term that encompasses settlement agreements like the Flores Agreement —

31

"shall not be affected by the enactment of [the HSA] . . . , but shall continue in effect . . . until amended, modified, superseded, terminated, set aside, or revoked in accordance with law."  See also 6 U.S.C. § 279(f)(2) (confirming that § 552(a) savings provision applies to transfer of functions from INS to Office "in the same manner" as it applies to transfer of functions from INS to DHS agencies).

The foregoing provisions support the argument that the authority the HSA transferred to the Office did not include custodial authority over UACs not involved in immigration proceedings.  As such, they create the tension between 8 U.S.C. § 1226(a), which limits detention to the pendency of immigration proceedings, and the suitable custodian requirement, which precludes the Office from releasing a UAC to an unsuitable custodian.  The HSA provisions, however, provide little guidance on how that tension should be resolved.  The HSA's transfer-of-authority provisions were enacted in 2002 — six years before the suitable custodian requirement became law.  For that reason alone, the transfer-of-authority provisions do not reveal Congress's intent with respect to the suitable custodian requirement.  Moreover, that Congress saw fit to alter provisions governing UACs just six years after the HSA's enactment suggests that Congress was not entirely satisfied with the existing statutory scheme.

32

Beltrán also maintains, however, that other provisions in 8 U.S.C. § 1232 — enacted contemporaneously with the suitable custodian requirement in 2008 — show that Congress did not intend to authorize the continued detention of UACs after the conclusion of their immigration proceedings.  In particular, she contends that, because § 1232(b)(1) delegates the "care and custody" of UACs to the Office "[c]onsistent with section 279 of Title 6," and because § 279 does not permit the detention of UACs after immigration proceedings have concluded, such detentions cannot be authorized by § 1232.  Beltrán further argues that § 1232(c)(3)(B)'s mandate that the Office "conduct follow-up services, during the pendency of removal proceedings, on children for whom a home study was conducted," demonstrates Congress's intent that the Office, like the INS before it, is entitled to detain UACs only while immigration proceedings are ongoing.

In our view, the provisions of § 1232 invoked by Beltrán fail to overcome the presumption created by the general-specific rule.  First, in § 1232(b)(1), the phrase "[c]onsistent with section 279 of Title 6" does not qualify or limit the grant to the Office of "responsibility" for "the care and custody of all" UACs.  Rather, that phrase simply reflects Congress's recognition that the responsibility identified in § 1232(b)(1) had been previously conferred on the Office by § 279.  It does

33

not show any congressional intent that the general limitation on detention authority to a period when immigration proceedings are pending would take precedence over the specific suitable custodian requirement.

Finally, the portion of § 1232(c)(3)(B) that requires the Office to conduct follow-up services for certain UACs "during the pendency of removal proceedings" likewise fails to overcome the presumption that the specific statutory provision controls the general one. Congress's decision to limit mandatory follow-up services to the pendency of removal proceedings does not clearly show that Congress intended to similarly limit other statutory responsibilities, including the Office's administration of the suitable custodian requirement. Indeed, it is entirely implausible that Congress would bury in a subparagraph concerned with follow-up services so significant a limitation on the Office's authority. See <u>Whitman v. Am. Trucking Ass'ns</u>, 531 U.S. 457, 468 (2001) (observing that Congress does not "hide elephants in mouseholes").[13]

---

[13] There is an additional reason that 8 U.S.C. § 1232(c)(3)(B) fails to illuminate congressional intent to limit the Office's authority over UACs to those involved in ongoing immigration proceedings. That is, in addition to mandating some follow-up services during the pendency of removal proceedings, § 1232(c)(3)(B) also authorizes (but does not require) follow-up services for UACs "with mental health or other needs who could benefit from ongoing assistance from a (Continued)

34

b.

The broader statutory scheme governing UACs, as well as Congress's purpose in enacting § 1232 of Title 8, reinforces our conclusion that the Office's responsibility for the care, custody, and placement of UACs is not limited to the pendency of immigration proceedings. A contrary reading would undermine the web of statutory provisions designed to protect UACs.

Section 1232 of Title 8 addresses the treatment of UACs throughout the immigration process, from arrest to either legal status or repatriation. It requires all federal agencies to transfer to the Office custody of any child determined to be a UAC within seventy-two hours of that determination. See 8 U.S.C. § 1232(b)(2), (3). The DHHS Secretary and the Office shoulder the responsibility for providing care to UACs in federal custody and for making appropriate placement determinations. See id. § 1232(b)(1), (c)(1)-(3). They are also charged with ensuring that UACs are appropriately represented in removal proceedings instituted by the DHS. See id. § 1232(c)(5)-(6).

Section 1232 also deals with the repatriation of UACs to their home countries. Paragraph (a)(1) directs the DHS

_____

social welfare agency." Notably, that authorization is not limited to the pendency of removal proceedings.

35

Secretary, in conjunction with the DHHS Secretary, the Secretary of State, and the Attorney General, to "develop policies and procedures to ensure that [UACs] in the United States are safely repatriated to their country of nationality or of last habitual residence." Subparagraph (a)(5)(A) obliges the Secretary of State, in conjunction with the Secretaries of DHS and DHHS, non-governmental organizations, "and other national and international agencies and experts," to create a pilot program "to develop and implement best practices to ensure the safe and sustainable repatriation and reintegration of [UACs] into their country of nationality or of last habitual residence." Subparagraph (a)(5)(B) requires the DHS Secretary to consider the State Department's Country Reports on Human Rights Practices, as well as the Trafficking in Persons Report, in determining whether to repatriate a UAC to a particular country. And subparagraph (a)(5)(C) mandates that the Secretary of State and the DHHS Secretary, with the assistance of the DHS Secretary, report to congressional committees "on efforts to improve repatriation programs for" UACs.[14]

---

[14] Under § 1522 of Title 8, UACs who obtain affirmative relief in immigration proceedings, such as asylum or adjustment of status, are covered by another program administered by the Office — the unaccompanied refugee minor ("URM") program. Under the URM program, the Office seeks to arrange for the prompt and appropriate placement of unaccompanied refugee children pursuant to state law. See 8 U.S.C. § 1522(d)(2)(B). Until such (Continued)

The intricate web of statutory provisions relating to UACs reflects Congress's unmistakable desire to protect that vulnerable group. The statutory heading of 8 U.S.C. § 1232 — "Enhancing efforts to combat the trafficking of children" — confirms that purpose. See United States v. Hatcher, 560 F.3d 222, 226 (4th Cir. 2009) (explaining that statutory heading or title may be considered in interpreting ambiguous statute).

Beltrán's position concerning the statutory scheme, however, would deny the protection of those statutory provisions to an entire category of UACs: those who have received deferred action but not adjustment of status to lawful permanent resident. If her argument prevailed, the Office would be obliged to release such a UAC to a parent or legal guardian, even if the parent or legal guardian openly stated an intention to harm the child.

When a statute is subject to two contrary interpretations, we should adopt the one that "effectuates rather than frustrates the major purpose of the legislative draftsmen." See Shapiro v. United States, 335 U.S. 1, 31 (1948). In our view, the government's interpretation of the statutory scheme is entirely

_____

placement is accomplished, the Office has the "legal responsibility" for a URM and may "make necessary decisions to provide for the [URM's] immediate care." Id. § 1522(d)(2)(B)(ii).

consistent with Congress's purpose of protecting UACs from trafficking and exploitation. Beltrán's preferred reading, by contrast, is at odds with that purpose.[15]

3.

Again, we require clear indications of contrary congressional intent to overcome the rule that the specific statutory provision controls the general one. See Crawford Fitting Co., 482 U.S. at 445. Our examination of the text, context, history, structure, and purpose of the relevant statutory provisions reveals no clear intent of Congress that the general rule — that an alien must be released upon termination of his immigration proceedings — controls against the specific and categorical prohibition barring the release of a UAC to an unsuitable custodian. Moreover, a contrary reading would frustrate Congress's primary purpose for enacting 8 U.S.C. § 1232 — protecting UACs from trafficking and exploitation — with respect to those UACs who have received deferred action. Accordingly, we are satisfied that, even after R.M.B.'s

---

[15] Beltrán and the government each point to asserted legislative history supporting their separate positions. The post-enactment statements on which Beltrán relies, however, are "in no sense part of the legislative history" of 8 U.S.C. § 1232 and do not assist our interpretive endeavor. See United Airlines, Inc. v. McMann, 434 U.S. 192, 200 n.7 (1977), superseded by statute as stated in Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581 (2004). Meanwhile, the government unhelpfully relies on generalized statements made on the Senate floor about a proposed bill that did not pass.

immigration proceedings concluded, the Office was not entitled to release him to anyone unless it first determined that the proposed custodian was capable of providing for his physical and mental well-being.

IV.

We turn now to Beltrán's constitutional contentions, which we review de novo. See Darden v. Peters, 488 F.3d 277, 284 (4th Cir. 2007). Beltrán asserts that the Office's continuing detention of R.M.B. contravenes the Fifth Amendment's Due Process Clause. That Clause provides that no person shall be "deprived of life, liberty, or property, without due process of law." See U.S. Const. amend. V. Like its Fourteenth Amendment counterpart, Fifth Amendment due process has both "substantive and procedural components." See Snider Int'l Corp. v. Town of Forest Heights, Md., 739 F.3d 140, 145 (4th Cir. 2014); see also Martin v. St. Mary's Dep't of Soc. Servs., 346 F.3d 502, 511 (4th Cir. 2003) (explaining that due process "guarantees more than fair process and includes a substantive component that provides heightened protection against government interference with certain fundamental rights" (internal quotation marks omitted)). Beltrán maintains that the Office has contravened

39

both components of due process.  We address those contentions in turn.[16]

A.

We begin with Beltrán's substantive due process claim.  The substantive component of due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them."  See Daniels v. Williams, 474 U.S. 327, 331 (1986).  We have characterized substantive due process as "far narrower in scope than procedural due process."  See Plyler v. Moore, 100 F.3d 365, 374 (4th Cir. 1996).  As one of our sister circuits has explained, there are "two strands of the substantive due process doctrine."  See Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008).  The first strand protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience."  Id.

In this appeal, Beltrán invokes only the fundamental rights strand of substantive due process.  She contends that the Office's refusal to release R.M.B. to her custody impermissibly interferes with his fundamental right to family integrity.

---

[16] It is appropriate to observe that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  See Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

40

Relying on the Supreme Court's 1993 decision in <u>Reno v. Flores</u>, 507 U.S. 292 (1993), the government responds that Beltrán has failed to identify any "fundamental liberty interest at issue in this case." <u>See</u> Br. of Appellee 42.

The identification of those rights that implicate substantive due process "has not been reduced to any formula." <u>See</u> <u>Obergefell v. Hodges</u>, 135 S. Ct. 2584, 2598 (2015) (internal quotation marks omitted). At minimum, however, they include those "deeply rooted in this Nation's history and tradition." <u>See</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 721 (1997) (internal quotation marks omitted). This proceeding involves "perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court — "the interest of parents in the care, custody, and control of their children." <u>See</u> <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000) (plurality opinion). We have agreed that "few rights" are "more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate." <u>See</u> <u>Jordan ex rel. Jordan v. Jackson</u>, 15 F.3d 333, 342 (4th Cir. 1994). Just as parents possess a fundamental right with respect to their children, children also enjoy a "familial right to be raised and nurtured by their parents." <u>See</u> <u>Berman v. Young</u>, 291 F.3d 976, 983 (7th Cir. 2002).

41

The fundamental right of a parent to control the upbringing of her child, however, is "neither absolute nor unqualified." See Martin, 346 F.3d at 506. Rather, that right is "subject to the child's interest in his personal health and safety and the state's interest as parens patriae in protecting that interest." See White ex rel. White v. Chambliss, 112 F.3d 731, 735 (4th Cir. 1997). On several occasions, we have upheld state policies designed to effectuate the parens patriae interest. See, e.g., White, 112 F.3d at 736; Jordan, 15 F.3d at 343-44.

In most situations — such as in the White and Jordan cases — the constitutionality of state actions that interfere with family integrity depends on the adequacy of the procedures available to contest them. Nevertheless, the Supreme Court has recognized that certain intrusions into the parent-child relationship may be so flagrant as to be invalid even if a fair process is afforded. See Troxel, 530 U.S. at 67 (sustaining fit parent's substantive due process challenge to statute providing for mandatory third-party visitation with court approval); Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary, 268 U.S. 510 (1925) (invalidating statute requiring children to attend public school through age sixteen); Meyer v. Nebraska, 262 U.S. 390 (1923) (striking down prohibition on teaching languages other than English below ninth grade and teaching in other than English); see also Stanley v. Illinois, 405 U.S. 645

42

(1972) (holding unconstitutional statutory scheme allowing children of unwed father to be declared dependent on state absent finding of unfitness).  In each of those situations, however, the challenged statute allowed a state to override the decisions of fit parents — i.e., those considered capable of providing for their children's needs.  Conversely, when a state's interference with parental control is predicated on a determination that the parent is unable to provide adequate care for a child, such interference does not contravene substantive due process, at least in the absence of governmental action that shocks the conscience.  Cf. Troxel, 530 U.S. at 68 (explaining that "there is a presumption that fit parents act in the best interests of their children" (emphasis added)).

In this situation, the Office has denied Beltrán's request that R.M.B. be released to her custody, deciding that Beltrán is incapable of providing for R.M.B.'s physical and mental well-being.  That determination suffices to address any substantive due process concerns, and it renders inapposite those decisions involving challenges to state interference with control of children by fit parents.  Accordingly, we reject Beltrán's substantive due process claim.

B.

We thus reach Beltrán's final contention:  that R.M.B. has been denied his right to procedural due process.  Beltrán

43

contends that the government has violated due process by failing to provide R.M.B. with a proper hearing before a judge or some other "impartial, competent adjudicator." See Br. of Appellant 44-46. The government, on the other hand, responds that it has provided sufficient mechanisms for challenging the Office's determination that Beltrán is unable to provide for R.M.B.'s care and custody, which Beltrán utilized.

1.

The procedural component of due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." See Mathews v. Eldridge, 424 U.S. 319, 332 (1976). The Office's continuing detention of R.M.B. implicates protected liberty interests, and the government does not contend otherwise. And when the government deprives a person of a protected liberty or property interest, it is obliged to provide "notice and opportunity for hearing appropriate to the nature of the case." See Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950).

Typically, a procedural due process issue is evaluated under the balancing standard that the Supreme Court articulated in 1976 in Mathews v. Eldridge. See Hamdi v. Rumsfeld, 542 U.S. 507, 529-30 (2004) (plurality opinion) (explaining that Mathews provides "ordinary mechanism" to determine what process is due);

44

<u>Santosky v. Kramer</u>, 455 U.S. 745, 754, 757 (1982) (applying <u>Mathews</u> to determine standard of proof essential to termination of parental rights). The <u>Mathews</u> framework consists of three factors:

> (1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements.

See <u>Turner v. Rogers</u>, 564 U.S. 431, 444-45 (2011) (alterations and internal quotation marks omitted).

2.

In denying Beltrán's procedural due process claim, the district court did not utilize the <u>Mathews v. Eldridge</u> framework. Indeed, neither of the parties advised the court of the potential applicability of the <u>Mathews</u> decision. In its Opinion, however, the court articulated other reasons for rejecting the procedural due process claim. Initially, the Opinion compared R.M.B.'s situation to those of the class of plaintiffs in <u>Flores</u>. The Opinion explained that, in <u>Flores</u>, the Supreme Court deemed the procedural due process claim of the alien children to be "merely the 'substantive due process' argument recast in procedural terms," and ruled that procedural due process "was satisfied by giving the detained alien juveniles the right to a hearing before an immigration judge."

45

See D.B., 119 F. Supp. 3d at 487 (citing Flores, 507 U.S. at 307-09). The Opinion then determined that "R.M.B. was afforded the same right to a hearing before an immigration judge, where his immigration proceedings were terminated." Id. Next, the Opinion invoked the rationale advanced by the government in this appeal: Because the Office had provided — and Beltrán had utilized — procedures for seeking family reunification, those procedures "satisf[y] any constitutional scrutiny." Id. at 488.

There are several material distinctions between this case and Flores, and we do not believe that Flores controls Beltrán's procedural due process claim. First, Beltrán is seeking custody of her own son, whereas the alien children in Flores were seeking to be released to unrelated adults. Second, R.M.B. is being held at a juvenile detention center; the Flores children, by contrast, were in less secure facilities. See Flores, 507 U.S. at 298 (explaining that alien children were not in correctional institutions but in facilities that met state requirements for care of dependent children). Third, R.M.B. is not similarly situated to the Flores plaintiffs, in that no immigration proceedings are pending against him. Cf. Demore v. Kim, 538 U.S. 510, 523 (2003) (observing that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process"). Lastly, that R.M.B. was afforded a brief hearing before an immigration judge is irrelevant to the

46

procedural due process claim, because the Office possesses the sole authority to order his release. Accordingly, we reject the district court's conclusion that this claim fails under Flores.

We likewise reject the district court's determination — endorsed by the government — that R.M.B. received sufficient process because Beltrán utilized the available family reunification request procedures. The mere availability and utilization of some procedures does not mean they were constitutionally sufficient. That is, the Fifth Amendment guarantees "due process of law," not just "some process of law." See Davidson v. City of New Orleans, 96 U.S. 97, 107 (1877) (Bradley, J., concurring).

Although we part company with the district court and the government on the procedural due process issue, we also reject Beltrán's contention that due process automatically required that R.M.B. be accorded a more substantial hearing prior to the Office rejecting the family reunification request. As the Supreme Court explained in 1972 in Morrissey v. Brewer, "due process is flexible and calls for such procedural protections as the particular situation demands." See 408 U.S. 471, 481 (1972). For example, the "hearing" required by the Due Process Clause need not be "an adversarial hearing, a full evidentiary hearing, or a formal hearing." See Buckingham v. Sec'y of U.S. Dep't of Ag., 603 F.3d 1073, 1082 (9th Cir. 2010) (citations and

47

internal quotation marks omitted); see also Bowens v. N.C. Dep't of Hum. Res., 710 F.2d 1015, 1020 (4th Cir. 1983) ("The judicial model of an evidentiary hearing is not a steadfast constitutional requirement." (internal quotation marks omitted)). The basic requirements of notice and an opportunity to be heard demand only that the complaining party receive notice of the reasons for the deprivation, an explanation of the evidence against him, and "an opportunity to present his side of the story." See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Beyond those requirements, the need for procedural safeguards is ordinarily measured by the three-factor framework established in Mathews v. Eldridge.

3.

As we noted above, the Mathews v. Eldridge framework was not utilized in the district court. When a judgment has been predicated on an erroneous legal standard, the proper remedy "is usually to remand for a determination under the appropriate standard." See Bauer v. Lynch, 812 F.3d 340, 352 (4th Cir. 2016) (internal quotation marks omitted). That remedy is warranted in this proceeding for several reasons. The three-factor Mathews framework is "flexible" and highly "fact-specific." See Ciambriello v. Cty. of Nassau, 292 F.3d 307, 319 (2d Cir. 2002). Moreover, the parties have not yet addressed that standard and how it might impact this case. As a "court of

48

review, not of first view," we are ill-suited to apply the fact-specific <u>Mathews</u> framework in the first instance.  See <u>Lovelace v. Lee</u>, 472 F.3d 174, 203 (4th Cir. 2006) (internal quotation marks omitted).  We therefore vacate the judgment with respect to the procedural due process claim and remand for further proceedings.

V.

Pursuant to the foregoing, we affirm the judgment with respect to the statutory and substantive due process claims.  On the procedural due process claim, however, we vacate and remand for such other and further proceedings as may be appropriate.

<u>AFFIRMED IN PART,</u><br/><u>VACATED IN PART, AND REMANDED</u>

FLOYD, Circuit Judge, dissenting:

The majority thoughtfully explains the authority of various federal government agencies over unaccompanied alien children. But this case does not feature an unaccompanied alien child. This case features an accompanied alien child.

R.M.B. is a child. He is an alien. But he is not unaccompanied. R.M.B.'s mother, Dora Beltrán, is here in the United States. She is a lawful permanent resident, J.A. 33, and has been protesting for more than two years that she is available to take custody of R.M.B.

The agency here does not want to release R.M.B. because it thinks that Beltrán is an unfit mother. Perhaps she is. But Congress has not empowered the federal Office of Refugee Resettlement to seize children from bad parents. The Office is only authorized to detain alien children whose parents are not available in the United States. Because Beltrán is "available to provide care" as defined in statute, the Office has no legal authority to detain R.M.B.

I am not insensitive to the majority's unstated concern that society is better off with R.M.B. in government custody. If that is true, any number of state or other federal government authorities may be legally authorized to act. But the question in this case is whether the Office has authority. It does not. I must respectfully dissent.

50

I.

As the majority notes, Congress has conferred to the Office the authority to detain unaccompanied alien children. Ante, at 23 & n.9. Congress defines an "unaccompanied alien child" (UAC) as a child who:

> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom—
>
> > (i) there is no parent or legal guardian in the United States; or
> >
> > (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). Thus, to be a UAC an individual must satisfy each of the three prongs: (A), (B), and (C).

R.M.B. satisfies prongs (A) and (B) of the statutory definition: he "has no lawful immigration status" and he "has not attained 18 years of age." Prong (C) can be satisfied in one of two ways. R.M.B. does not satisfy prong (C) the first way; he has a parent, Beltrán, "in the United States." Whether or not R.M.B. is legally an "unaccompanied alien child"—and, therefore, whether the Office has authority to detain him—thus turns on whether or not he satisfies prong (C) the second way— that is, whether Beltrán "is available to provide care and physical custody."

51

Thus far, the majority and I agree. We also agree that in interpreting the UAC statute, we begin with "the plain meaning of the text." Trejo v. Ryman Hosp. Props., Inc., 795 F.3d 442, 446 (4th Cir. 2015). But in our reading of "available to provide care," the majority and I part ways. I think the text means just what it says: a child is not unaccompanied in the United States if a parent is available to provide care. Beltrán is available to provide care; R.M.B. is not, therefore, unaccompanied.

The majority interprets the same text to mean "capable of providing for the child's physical and mental well-being." Ante, at 26. There are several problems with this reading, not the least of which is that it is not what the statutory definition says. This interpretation also reads the key word— "available"—out of the statute; whatever gloss the other words place on "available," that word must play some role. But the more fundamental problem with the majority's interpretation is that it comes from reading 6 U.S.C. § 279(g)(2)(C)(ii) independent of its statutory context. "In determining the plain meaning of the text, we must consider the broader context of the statute as a whole in light of the cardinal rule that the meaning of statutory language, plain or not, depends on context." Trejo, 795 F.3d at 446 (quotations omitted). With

respect, the majority's reading does not fit with the text.  And it jars with the context.

A.

The majority makes short work of Beltrán's statutory argument that her son R.M.B. is not an unaccompanied alien child:  three paragraphs in a nearly 50-page opinion.  <u>Ante</u>, at 25-27.  And only a portion of those few paragraphs construes the key statutory definition.  More is not always better.  But in this instance, I think depth brings clarity.

The majority first notes Beltrán's use of a dictionary to define "available" as "easy or possible to get or use."  <u>Ante</u>, at 25 (citing Appellant's Br. 19).  Without disputing this linguistic definition, the majority characterizes its use as equivalent to an argument that the definition in 6 U.S.C. § 279 (g)(2)(C)(ii) "does not include an assessment of a parent's fitness or suitability as a custodian."  <u>Ante</u>, at 25.  The majority reads in such a suitability assessment by emphasizing that the word "available" is followed by the words "to provide care."  <u>Ante</u>, at 25-26.  The majority then goes to a dictionary to expand on the word "care" and, importing its chosen definition, finds that a parent "must be" "available to provide what is necessary for the child's health, welfare, maintenance, and protection."  <u>Ante</u>, at 26.  I might quibble

53

with the particular substituted definition, but regardless, the statute thus construed still asks only if the parent is "available" to provide; the text still "does not include an assessment of a parent's fitness or suitability as a custodian." Ante, at 25.

At this point, Beltrán still might prevail under the majority's analysis. But rather than apply its own reading of the UAC definition and ask whether Beltrán was available to provide for R.M.B., the majority relies on a distinct, non-definitional provision of the statute to conclude that the UAC definition contains an unstated suitability assessment. Specifically, the majority determines that: "a parent who is not 'capable of providing for the child's physical and mental well-being'—as mandated by the suitable custodian requirement of 8 U.S.C. § 1232(c)(3)(A)—is not available to provide what is necessary for the child's health, welfare, maintenance, and protection." Ante, at 26. It is from this cross-statute incorporation that the majority reads "an assessment of a parent's fitness or suitability" into the UAC definition.[1]

---

[1] The majority later makes explicit that it is substituting 8 U.S.C. § 1232's "suitable custodian requirement" in place of 6 U.S.C. § 279's definition of an "unaccompanied alien child": "Because the Office's unsuitability finding establishes that Beltrán is not available to provide care and physical custody of R.M.B., we cannot say that R.M.B.'s detention is based on an (Continued)

However, the Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." <u>Arlington Cent. School Dist. Bd. of Educ. v. Murphy</u>, 548 U.S. 291, 296 (2006). <u>Accord, e.g.</u>, <u>Ross v. Blake</u>, 578 U.S. __, (2016) (slip op., at 4-8). There is no reason to presume that when Congress defined UACs to exclude alien children who have an available parent in the United States that Congress meant anything different than what it said. The statutory UAC definition does not use the words "assessment," "fitness," or "suitability." And the majority's reliance on the different language from a non-definitional part of the statute "denies effect to Congress' textual shift, and therefore 'runs afoul of the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" <u>Roberts v. Sea-Land Servs., Inc.</u>, 132 S. Ct. 1350, 1357 n.5 (2012) (quoting <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 711, n.9 (2004)); <u>cf.</u> <u>Meese v. Keene</u>, 481 U.S. 465, 484 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term.")

---

erroneous application or interpretation of the UAC definition." <u>Ante</u>, at 26-27.

55

Aside from the problematic reliance on the non-definitional language, the majority over-reads the words "to provide care" that follow the word "available." Those following words are part of the statutory definition, and it is natural to read them as informing the sense in which "available" is used. But it is unnatural to read them to transmute the word Congress used—"available"—into a wholly different word. The alchemy of plain meaning is not so powerful. Rather, those following words speak to situations in which a parent's availability is limited in a straightforward way. If a parent were, for example, incarcerated, they might be "available to speak on the phone" but likely would not be "available to provide care."

Of course the Supreme Court's presumption "that a legislature says in a statute what it means and means in a statute what it says there," Murphy, 548 U.S. at 296, is just that: a presumption. It can be overcome. Although I conclude that the plain meaning of "available" is available, my disagreement with the majority on this issue is not solely the result of looking at a statutory word or four and seeing a different meaning. The more fundamental reason that I cannot join in the majority's reading is that, as discussed below, it simply does not accord with the statutory context.

56

B.

A laser focus on isolated words risks missing the forest for the trees. One need not accept what I consider the most natural reading of "available to provide care" to reject the majority's construction. The statutory context readily dispels the notion that myriad federal agencies are required to make ad hoc parental suitability determinations in the field.

1.

The repeated use of the acronym "UAC," although efficient, obscures the precise term that 6 U.S.C. § 279(g)(2) is defining. The words "available to provide care and physical custody" in 6 U.S.C. § 279(g)(2)(C)(ii) help define what makes an individual an "unaccompanied alien child." Specifically, the words in subsection (ii) define whether an individual is accompanied or not.

The statutory UAC definition has three prongs, one for each of three relevant characteristics. An individual is an "alien" if he or she "has no lawful immigration status in the United States," id. § 279(g)(2)(A); is a "child" if he or she "has not attained 18 years of age," id. § 279(g)(2)(B); and is "unaccompanied" if "no parent or legal guardian in the United States is available to provide care and physical custody," id.

57

§ 279(g)(2)(C)(ii). If an individual has all three characteristics, he or she is an "unaccompanied alien child."

It thus strikes me that however we read "available" in prong (C), it must go to the question of whether an alien child is accompanied in the United States or not. As a purely linguistic matter, I do not think that a parent's "fitness" speaks to whether the parent is accompanying a child. Put another way, a child can be accompanied by an unfit parent. It is much harder, linguistically and practically, to be accompanied by an unavailable parent.

One additional observation before looking outside of 6 U.S.C. § 279(g)(2): both parts of prong (C) speak broadly of a parent being "in the United States." This language strongly suggests that in drafting the statute, Congress was concerned with whether a child was accompanied in the sense of having a parent in the territory of the United States, and not accompanied in the sense of having a parent holding the child's hand at all times. The "in the United States" language is difficult to harmonize with an accompaniment status that changes every time a parent goes to work, drops a child off at school, or runs to the grocery store. It is much easier to read the language in harmony with a legislative concern about, for

58

example, children who cross the border into the United States without their parents.[2]

This does not mean that a parent is necessarily "available to provide care" simply because she or he is somewhere in the territory of the United States. The first part of prong (C) of the UAC definition sets the baseline that a child is not unaccompanied if they have a "parent or legal guardian in the United States"; the second part of prong (C) acknowledges the reality that although physically present, a parent in the United States may not be "available to provide care and physical custody" as a practical matter. 6 U.S.C. § 279(g)(2)(C). One obvious application, alluded to earlier, would be to a parent

---

[2] See Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Introduction (January 30, 2015), http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-0 (suggesting that "unaccompanied children" are those "who enter the United States . . . without a parent"). I note that although it does not appear that our sister circuits have construed the definition, the few decisions that reference 6 U.S.C. § 279(g)(2) appear to assume that UAC status does not turn on a parental fitness assessment. See, e.g., Cortez-Vasquez v. Holder, 440 F. App'x 295, 298 (5th Cir. 2011); Tambaani v. Attorney Gen. of U.S., 388 F. App'x 131, 134 (3rd Cir. 2010). I also note that the Office does not appear to read the statute as the majority does. The Office's primary argument is that the federal courts lack jurisdiction to review agency application of the UAC statute; the majority, as do I, rightly rejects this argument. See ante, at 16-18. When the Office does take a position on the scope of the statutory definition, it suggests parental proximity, rather than fitness, is the touchstone. See, e.g., Appellees' Br. 29 n.7. I presume this is why the Office has not taken custody of those of Beltrán's other minor children who are aliens.

who is incarcerated or otherwise in custodial detention in the United States. It would be absurd to conclude that Congress intended the Office to turn away vulnerable children on the basis that they were accompanied by a jailed parent. Another likely application is to parents in the United States whose existence is not known to federal authorities. If a parent refuses to make herself available to take custody of a child—perhaps out of a concern for her own immigration status—Congress could hardly have expected the Office to release the minor on his or her own.

2.

Beyond Section 279(g)(2), the "broader context of the statute," Trejo, 795 F.3d at 446, strongly counsels against reading an extra-textual parental fitness assessment into the definition of "unaccompanied." As the majority observes, "[t]he care and custody of UACs by the government is governed by a legal framework consisting primarily of two statutory provisions--§ 279 of Title 6 and § 1232 of Title 8." Ante at 19. The term "unaccompanied alien child" appears in numerous places in each, and both provisions make explicit that the definition in 6 U.S.C. § 279(g)(2) controls throughout. See 6 U.S.C. § 279(g); 18 U.S.C. § 1232(g). The Office refers to these statutes as "the UAC statutes." E.g., Appellees' Br. 33.

60

A quick skim of the statutes makes plain that the Office's authority runs only to UACs; every relevant statutory grant of authority to the Office is conditioned on the existence of an unaccompanied alien child. This fact is important, as "an agency literally has no power to act . . . unless and until Congress confers power upon it." New York v. FERC, 535 U.S. 1, 18 (2002) (quoting La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)). Like all federal agencies, the Office of Refugee Resettlement is "a creature of statute. It has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." Michigan v. EPA, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

The core statutory authority the Office relies on for the legality of its continued detention of R.M.B. is 8 U.S.C. § 1232(c)(3)(A). See Appellees' Br. 26 n.4 ("The reason R.M.B. is still in ORR custody is . . . the Congressional mandate in 8 U.S.C. § 1232(c)(3)(A).") The majority refers to this provision as the "suitable custodian requirement." Ante, at 9. Section 1232(c)(3)(A) provides:

> [A]n unaccompanied alien child may not be placed with a person or entity unless the [Secretary] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.

61

The Office refuses to "place" R.M.B. with Beltrán because it has determined that Beltrán is incapable and thus not a suitable custodian.

If Beltrán were only to dispute the wisdom of the Office's determination, my view of the Office's position might be different. But Beltrán disputes the Office's <u>authority</u> to make the determination at all. This is why the case is before us on a habeas petition and not, for example, via the Administrative Procedure Act. <u>See</u> 5 U.S.C. § 702. Congress has only conferred to the Office the authority to make placement determinations for unaccompanied alien children: 8 U.S.C. § 1232(c)(3)(A) explicitly states that "an <u>unaccompanied alien child</u> may not be placed." (emphasis added). If R.M.B. is not unaccompanied, the Office "literally has no power to act" over him, <u>New York</u>, 535 U.S. at 18, whether it is purporting to detain him, place him, or otherwise.

In my view, the text and structure of 8 U.S.C. § 1232 preclude reading the UAC definition in 6 U.S.C. § 279(g)(2) to include a parental fitness component. The Office's application of these statutes to R.M.B. and Beltrán is illustrative. Under the majority's reading, the suitable custodian requirement in Section 1232(c)(3)(A) becomes superfluous: a determination that Beltrán is suitable would simultaneously operate to make her available under the majority's reading of Section 279(g)(2);

62

this would render R.M.B. not a UAC, making the placement determination both unnecessary and beyond the Office's authority. In cases in which a child has a parent in the United States, the majority's reading makes the UAC determination and the suitable custodian determination redundant. The Supreme Court has admonished:

> It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a harmonious whole.

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quotations omitted). It is quite possible to fit Section 279(g)(2) and Section 1232(c)(3)(A) into a harmonious whole. Reading the former to enquire of a parent's availability, and the latter to ask of an alternate custodian's suitability, reveals a coherent regulatory scheme—one that recognizes that Congress never intended the Office to be making Section 1232(c)(3)(A) determinations for a child whose parent is knocking on the Office's door.[3]

---

[3] The Office appears to concede that its authority ends once an individual ceases to be an "unaccompanied alien child." It recognizes that its authority ends once R.M.B. "turns eighteen." Appellees' Br. 1. It also recognizes that its authority ends if R.M.B. gains "lawful immigration status." Id. at 40 n.14. In other words, the Office's custodial authority ends when R.M.B. is either not a "child," or not an "alien." The text of the UAC (Continued)

63

Another contextual problem with fitting the majority's UAC definition into the statutory scheme becomes apparent when considering how R.M.B. wound up in Office custody. As the Office repeatedly reminds the Court, it was Customs and Border Protection (CBP) that first classified R.M.B. as a UAC before transferring him to the Office. The majority correctly holds that we are not concerned here with CBP's detention authority, because habeas only tests current detention and R.M.B. is currently being detained by the Office. Ante, at 27 n.10.[4]

However, this does not make CBP's involvement irrelevant. The statutory UAC definition in 6 U.S.C. § 279(g)(2) applies to all federal agencies, not just the Office. (Indeed, the Office

definition provides no indication that custodial authority does not also end when R.M.B. is no longer "unaccompanied."

[4] I understand this holding to implicitly reject one of the Office's alternative arguments; I will explicitly reject it. The Office suggests that once CBP classified R.M.B. as a UAC, the Office was powerless to classify him otherwise. Congress did not give federal agencies discretion to classify individuals as UACs. Congress provided an explicit statutory definition. An individual who satisfies the definition is a UAC and must be treated as such; if the individual does not satisfy the definition, the government has no nebulous discretionary authority to treat the individual as a UAC. If CBP wrongly classified R.M.B. as a UAC in violation of statute, transferring R.M.B. to another federal agency does not cure the violation. R.M.B. is a UAC if 6 U.S.C. § 279(g)(2) says he is, not if the government declares him so. The Office cannot expand its statutory authority by arguing that some other agency violated the statute first.

64

generally does not take custody of a child in the first instance; it receives custody of children from other federal agencies.) It is axiomatic that "available" has the same meaning when the statute is read by an employee of one federal agency as it does when the same statute is read by an employee of a different federal agency.

The Office tells us that "federal agents who encounter a child . . . are tasked with quickly determining whether a child is a UAC and transferring the child to HHS." Appellees' Br. 28. Congress mandates each agency to notify HHS of "discovery of an unaccompanied alien child" within 48 hours and, except in exceptional circumstances, transfer custody within 72 hours. See 8 U.S.C. § 1232(b). Congress could reasonably expect a federal agent to determine whether a child has a parent in the United States within this time frame. I cannot see how agents could be expected to make parental suitability determinations in this window.

Congress has created a "coherent regulatory scheme," Brown & Williamson, 529 U.S. at 133, for minor aliens present in the United States without a parent or legal guardian. The statutes work as a harmonious whole when "available" in 6 U.S.C. § 279(g)(2) is read to mean "available." By reading "available" to mean something else, the majority turns the UAC definition into a square peg that does not fit into the statutory whole.

65

C.

It is not only the text of the definition and the context of the statute that I think foreclose the majority's construction of "available to provide care." I am also concerned by the necessary consequences of that construction. I do not mean the practical consequences for Beltrán or R.M.B., or anyone else; I mean the consequence that the statutory scheme thus interpreted raises unnecessary constitutional questions.

As the Supreme Court has explained, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." Clark v. Martinez, 543 U.S. 371, 380-81 (2005). The majority construes the statutes to permit an administrative agency of the federal government to involuntarily detain a lawful permanent resident's child if the agency decides that the resident is an unfit parent.[5]

---

[5] Nothing in the majority's construction would appear to bar the Office from detaining the alien child of a U.S. citizen in the United States. The UAC definition only addresses the child's immigration status. If Beltrán naturalizes, it has no obvious effect on the operation of 6 U.S.C. § 279(g)(2).

To be sure, the Constitution does not forbid the government from removing children from unfit parents. However, such an exercise of state power is generally conditioned by significant procedural safeguards. See, e.g., Stanley v. Illinois, 405 U.S. 645, 658 (1972) (holding that "parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody"). Congress's power over immigration is very broad, and in this arena Congress "regularly makes rules that would be unacceptable if applied to citizens." Reno v. Flores, 507 U.S. 292, 305-06 (1993) (quotation omitted). But this power is not absolute, and in these circumstances it confronts constitutional rights that are among the most basic and resistant to government interference: the right "to raise one's children," e.g., Stanley, 405 U.S. at 651, and the right to "freedom from bodily restraint" that "has always been at the core of the liberty protected by the Due Process Clause." Foucha v. Louisiana, 504 U.S. 71, 80 (1992). Both Beltrán and R.M.B. are entitled to the protections of due process. See Zadvydas v. Davis, 533 U.S. 678, 693 (2001) (collecting cases).

If a federal agency seized a citizen child from a citizen parent without a hearing, under a statute analogous to that here, I am skeptical that such action would survive constitutional scrutiny. Although the constitutional concerns are decidedly attenuated for aliens, Flores, 507 U.S. at 305-06,

67

they are significant enough that the majority devotes ten pages to addressing them. Ante, at 39-49. And with regard to Beltrán's procedural due process claim, the majority concludes it must vacate the district court's holding on the issue and remand for additional proceedings. Ante, at 49.

I do not suggest that all or any portion of 6 U.S.C. § 279 or 8 U.S.C. § 1232 is unconstitutional. I only suggest that there is no need to read those statutes such that their constitutionality is even in question. A chief justification of the canon of constitutional avoidance "is that it allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." Clark, 543 U.S. at 381. Cf. Zadvydas, 533 U.S. at 682 (construing an immigration statute "to contain an implicit 'reasonable time' limitation" due to "serious constitutional concerns" with the "indefinite detention" of certain aliens).

As I read the statutes here, the federal government may take custody of alien minors who do not have a parent or other legal guardian available in the United States. The constitutional concerns with such a regulatory scheme are minimal. See, e.g., Flores, 507 U.S. at 305 ("If we harbored

68

any doubts as to the constitutionality of institutional custody over unaccompanied juveniles, they would surely be eliminated as to those juveniles . . . who are aliens.")  But as the majority construes these statutes, the constitutional questions are very real.  Cf. id. at 302-03.

A "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  Camreta v. Greene, 563 U.S. 692, 705 (2011) (quotation omitted).  Cf. Zadvydas, 533 U.S. at 689 ("We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation.")  There is no need to decide any constitutional questions here.  We need only read the statutes as written.


## II.

On my view of the Office's statutory authority, there is no need to address the other issues reached by the majority. Questions about the full statutory scope of the Office's authority over UACs, or the constitutionality of that authority in application, are moot in my mind.  Because the Office has no statutory authority to detain R.M.B., we should order the Office to stop detaining him.

I note that such an order need not—and perhaps should not—result in R.M.B. being released from all government custody.  I

detect in the majority opinion, and in the opinion of the district court, a concern about the risk R.M.B. poses to society. Although many of the allegations the government appellees introduce into the record are unsubstantiated, I am under no illusion about R.M.B. I am also not insensitive to the possibility that his best interests may not be served by being released to Beltrán.

There are legally authorized processes to address these concerns. For example, if federal or state authorities have probable cause to suspect R.M.B. has committed a crime, he can be arrested. If state child welfare agencies are concerned about Beltrán's fitness to exercise custody over R.M.B., those agencies have the statutory authority—and perhaps the obligation—to intervene. But just because there may be a valid authority to detain R.M.B., it does not mean that any claimed authority is valid. I conclude that the Office lacks statutory authority over R.M.B. and that the agency's continued detention of him—now for more than two years—is unlawful.

I respectfully dissent.