# United States Tax Court

164 T.C. No. 1

CAPITOL PLACES II OWNER, LLC, HISTORIC PRESERVATION
FUND 2014 LLC, A PARTNER OTHER THAN THE TAX MATTERS
PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 16536-23.　　　　　　　　　　Filed January 2, 2025.

————

C, an LLC, donated to a historic preservation organization an easement over the exterior of a building in a registered historic district in Columbia, South Carolina. Relying on a professional appraisal, C claimed a charitable contribution deduction of $23,900,000 for a qualified conservation contribution under I.R.C. § 170(h) on its 2014 tax return.

R examined C's return and issued a notice of final partnership administrative adjustment (FPAA) determining to disallow the charitable contribution deduction. P, the notice partner of C, timely filed a petition in this Court challenging the FPAA.

*Held*: P failed to establish that the building was a "certified historic structure" as defined in I.R.C. § 170(h)(4) because the building was not listed in the National Register of Historic Places and the Secretary of the Interior had not issued a certification of historic significance to the Secretary of the Treasury.

*Held, further*, C failed to make a qualified conservation contribution under I.R.C. § 170(h) because

the easement deed did not demonstrate a valid conservation purpose under I.R.C. § 170(h).

*Held, further*, C could not unilaterally alter or amend the conservation purposes listed in the easement deed after the fact.

————

*Sarah L. Ray*, *Frank Agostino*, *Michelle A. Levin*, *Sarah E. Green*, and *Logan C. Abernathy*, for petitioner.

*David N. Stock*, *Joseph E. Nagy*, *Anita A. Gill*, *Sahir Rama*, *Mark J. Miller*, *William M. Rowe*, and *Kathryn E. Kelly*, for respondent.

OPINION

URDA, *Judge*:  Capital Places II Owner, LLC (CPII), donated a facade easement in December 2014 over the Manson Building (Building), an early 20th-century design located in a historic district of Columbia, South Carolina.  *De rigueur* CPII claimed a hefty charitable contribution deduction (more than $23 million) for agreeing not to touch the exterior of this district standout, and the Commissioner called foul.

The Commissioner has moved for partial summary judgment, arguing that the donation fails to qualify as a "qualified conservation contribution" within the meaning of section 170(f)(3)(B)(iii) and (h) because it was not "exclusively for conservation purposes" as required by section 170(h)(1)(C).[1]  The Commissioner contends that the easement deed did not protect any of the conservation purposes recognized in the Code, most specifically that the Building was not a "certified historic structure" under section 170(h)(4)(C).  We agree and will grant partial summary judgment.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

*Background*

The following facts are derived from the parties' pleadings, motion papers, and declarations and exhibits attached thereto. They are stated solely for purposes of deciding the motion for partial summary judgment and not as findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).[2]

The Building is a three-story classical revival masonry building designed by James Urquhart, an architect prominent in early 20th-century Columbia. Over the decades the Building went through its fair share of alterations and remodeling, perhaps most prominently the addition of a stucco facade to the top two floors in the 1960s. The early 2000s brought rehabilitation with a price: The removal of modern surface material damaged the Building's brick and flush stone ornamentation.

In June 2000 the then owner of the Building submitted an application to the National Park Service (NPS) to determine the Building's eligibility for listing on the National Register of Historic Places (National Register). NPS denied the application on October 19, 2000, finding that the Building "does not appear to meet the criteria for individual listing on the National Register" because it "has lost important character-defining features" and "[m]any of the storefronts on the first floor have also been altered." After concluding that the Building "does not qualify as a 'certified historic structure,'" NPS further noted that, while the building was not "within an existing registered historic district or potentially eligible district," it "could potentially contribute to a historic distric" [sic] "[b]ecause of its scale and prominence." According to a declaration by Joy Beasley, the Keeper of the National Register, the Building "is not individually listed in the National Register," and NPS "has no record of the . . . Building ever being individually listed in the National Register."

On September 5, 2014, the Historic Columbia Foundation, assisted by South Carolina's State Historic Preservation Officer, submitted to the NPS Form 10-900, National Register of Historic Places Registration Form, nominating the Columbia Commercial Historic

---

[2] CPII is a limited liability company formed under the laws of the State of South Carolina and is treated as a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71.

District, in Columbia, South Carolina, for listing in the National Register of Historic Places as a historic district at the local level of significance. The form listed a total of 54 commercial buildings within the historic district, identifying 36, including the Building, as "contributing" and 18 as "noncontributing." The application was approved, and the Columbia Commercial Historic District was listed in the National Register on October 20, 2014. However, the Secretary of the Interior was not asked to certify and did not certify that, in the words of section 170(h)(4)(C), the Building is "of historic significance to the district."

On December 17, 2014, CPII (which had become owner of the Building according to the well-practiced minuet oft seen in conservation easement cases) recorded a historic preservation easement deed, granting a facade easement over the Building to the Historic Columbia Foundation. The deed stated "the Building was listed in the National Register of Historic Places in 2014 as a contributing resource of the Columbia Commercial Historic District . . . and, as such, is a 'certified historic structure' as defined under Section 170(h)." The grant was "specifically limited to the Building Façade and the Development Rights," and the purpose was "to assure that the Building Façade will be retained and maintained forever in its rehabilitated condition and state exclusively for conservation and preservation purposes." The "Building Façade" was defined as "the Building's entire exterior including but not limited to the front, side and rear exterior walls, height, roof, roof lines, color, building materials and windows."

CPII filed a short-year 2014 income tax return covering the period from December 4 through December 31, 2014, and claimed a charitable contribution deduction related to its conservation easement donation. The IRS disallowed the deduction and issued a notice of final partnership administrative adjustment, alleging inter alia that the alleged donation failed to satisfy the statutory and regulatory requirements for a noncash charitable contribution deduction.

*Discussion*

I.    *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material

fact and a decision may be rendered as a matter of law.  Rule 121(a)(2); *Sundstrand Corp.*, 98 T.C. at 520.

In deciding whether to grant summary judgment, we construe factual materials and draw inferences therefrom in the light most favorable to the nonmoving party.  *Sundstrand Corp.*, 98 T.C. at 520. The nonmoving party may not rest upon mere allegations or denials of his pleadings but rather must set forth specific facts showing that there is a genuine dispute for trial.  Rule 121(d); *see Sundstrand Corp.*, 98 T.C. at 520.

II.    *Legal Framework*

A.    *Conservation Purposes*

To claim a charitable contribution deduction for the donation of a partial interest in property, such as an easement, the contribution must be "exclusively for conservation purposes."  I.R.C. § 170(h)(1)(C).  The Code defines conservation purposes to include, as relevant here, "the preservation of an historically important land area or a certified historic structure."  *See* I.R.C. § 170(h)(4)(A)(iv).  The term "certified historic structure," in turn, encompasses "(i) any building, structure, or land area which is listed in the National Register" or "(ii) any building which is located in a registered historic district (as defined in section 47(c)(3)(B)[3]) and is certified by the Secretary of the Interior to the Secretary as being of historic significance to the district."  I.R.C. § 170(h)(4)(C).[4]

This wording largely tracks section 47(c)(3)(A), which defines a "certified historic structure" for purposes of eligibility for the

---

[3] Section 47(c)(3)(B) defines the term "registered historic district" to include "any district listed in the National Register," as well as any district that is both (I) designated under a state or local statute that itself has been "certified by the Secretary of the Interior to the Secretary as containing criteria which will substantially achieve the purpose of preserving and rehabilitating buildings of historic significance to the district" and (II) certified by the Secretary of the Interior to the Secretary as meeting substantially all of the requirements for the listing of districts in the National Register.

[4] A building, structure, or land area must satisfy these prerequisites "either at the time of the transfer or on the due date (including extensions) for filing the transferor's return . . . for the taxable year in which the transfer is made."  I.R.C. § 170(h)(4)(C) (flush language).

rehabilitation credit.[5]    Like section 170(h)(4)(C), section 47(c)(3)(A) employs the term "certified historic structure," defining it to include a building either (i) listed in the National Register or (ii) located in a registered historic district and certified by the Secretary of the Interior to the Secretary of the Treasury as being of historic significance to the district.  Section 47(c)(3)(A), as it is known now, was added first in the Tax Reform Act of 1976, Pub. L. No. 94-455, § 2124, 90 Stat. 1520, 1916. Congress then recycled nearly identical language, i.e., the "certified historic structure" definition and certification framework, four years later when enacting what became section 170(h)(4) as part of the Tax Treatment Extension Act of 1980, Pub. L. No. 96-541, § 6(b), 94 Stat. 3204, 3207.

B.    *Regulatory Framework*

The meaning of the term "certified historic structure" in section 170(h)(4)(C) is patently linked to the National Register, which dates from 1966.  *See* National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966).  In that Act, Congress authorized the Secretary of the Interior "to expand and maintain a national register [composed] of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, and culture." *Id.* § 101(a)(1), 80 Stat. at 915.  Among other things, the Act provided authority to establish grant programs for states and the National Trust for Historic Preservation, *id.* § 101(a)(2) and (3), and required federal agencies to "take into account the effect of [any] undertaking on any [property] that is included in the National Register," *id.* § 106, 80 Stat. at 917.  The Act further directed the Secretary to establish criteria to guide state efforts "for the preservation, acquisition, and development of such properties," *id.* § 101(a), and the President to "issue such regulations . . . as he deems desirable" in order "to assure consistency in policies and actions under this Act with other related Federal programs and activities," *id.* § 104(b), 80 Stat. at 917.

1.    *Listing Regulations*

To implement the purposes of the Act the Department of the Interior (Interior) issued regulations defining, inter alia, the mechanisms for nominations to the National Register, criteria for evaluation, and the means of publication.  36 C.F.R. § 60.1–60.17 (1976).

---

[5] We note that section 47(c)(3)(A) went through several numbering changes over the years.  We will refer to the current section numbering for purposes of clarity.

As described in the current version of the regulations, last revised in 1981, the "National Register was designed to be and is administered as a planning tool," and "[l]isting in the National Register" makes property owners eligible for federal grants for historic preservation. 36 C.F.R. § 60.2(a) and (b) (1982). The regulations expressly recognize that tax-related provisions might apply to properties listed in the National Register, including provisions (1) encouraging the preservation of depreciable historic structures, (2) discouraging destruction of historic buildings by eliminating certain otherwise available federal tax provisions, and (3) relating to charitable contributions for conservation purposes of partial interest in historically important land areas or structures. *Id.* para. (c).

During the period between 1976 and 1980 (when sections 47(c)(3) and 170(h)(4) were added), the applicable regulations provided for enlargement of the National Register by Act of Congress, declaration by Secretary of the Interior, and nominations by states and federal agencies that NPS subsequently approved. *See* 36 C.F.R. § 1202.2(d) (1980); 36 C.F.R. § 60.2(d) (1976). The regulations established a highly reticulated scheme for processing and evaluating various types of potential listings, as well as to account for changes to listed properties and the removal of properties from the National Register. Nominations were to be made on prescribed forms, *see* 36 C.F.R. § 1202.10 (1980); 36 C.F.R. § 60.10 (1976), and notice of such nominations was to be published in the Federal Register, followed by a 15-day public comment period, *see* 36 C.F.R. § 1202.13(a) (1980); 36 C.F.R. § 60.13(a) (1976). The regulations further provided that a notice of listing would be placed in the Federal Register. *See* 36 C.F.R. § 1202.13(b) (1980); 36 C.F.R. § 60.13(b) (1976). With minor modifications, the regulatory scheme in place during 1976 through 1980 continues to govern today.

### 2.     *Certification Regulations*

In response to Congress's assignment of authority to the Secretary of the Interior to make various certifications related to the National Register, Interior promulgated regulations governing the certification process. 36 C.F.R. § 67.1 (1978). As most relevant here, Interior outlined the procedures under the Tax Reform Act of 1976 "for the following categories of certification: (1) That a structure is listed in the National Register; (2) that a structure is located within a Registered Historic District but is or is not of historic significance to such district." 36 C.F.R. § 67.4(a) (1978).

As to listed structures, the regulation advises: "To determine whether or not a property is individually listed in the National Register, the owner should consult the listing of National Register properties in the Federal Register (found in most large libraries)." 36 C.F.R. § 67.4(b)(1) (1978). This direction to consult the Federal Register (in a large library) has remained in subsequent versions of the regulation, including the current one. *See, e.g.*, 36 C.F.R. § 67.4(b) (2011). The regulations currently in effect note that "[s]ome properties individually listed in the National Register include more than one building." *Id.* para. (d)(2). "In such cases, the owner must submit a single part 1 application," and the Secretary of the Interior will "determin[e] which of the buildings included within the listing are of historic significance to the property." *Id.*

As to the second category, the regulation provides that if an owner of a property in a Registered Historic District "wishes the Secretary to certify as to whether the structure is of historic significance to the district, the owner must make written application," providing specific information listed in the regulation. 36 C.F.R. § 67.4(c) (1978). The regulation further provided that Part I of a "Historic Preservation Certification Application" shall be used in requesting an evaluation from the Secretary. *Id.* para. (d). Although the procedures for routing the application changed over time, the requirements of a written application and the use of Part I of an "Historic Preservation Certification Application" were constant through the years. *See, e.g.*, 36 C.F.R. § 67.4(c) (2011).

Subsequent versions of these regulations expressly acknowledged the passage of the Tax Treatment Extension Act of 1980, which tracked in nearly identical text the structure and elements (including the certification requirement for properties in Registered Historic Districts) of the "certified historic structure" definition in the Tax Reform Act of 1976. *See* 36 C.F.R. § 67.1(a) (1984). Although certain nonsubstantive changes have been made to the regulations, the preamble to the current version expressly recognized that "Section 170(h) also designates the Secretary of the Interior as the authority who receives applications and issues certifications verifying to the Secretary of the Treasury that the building or buildings contribute to the significance of a historic district." Historic Preservation Certifications for Federal Income Tax Incentives, 76 Fed. Reg. 30,539, 30,539 (May 26, 2011); *see also* Historic Preservation Certifications Pursuant to Section 48(g) and Section 170(h) of the Internal Revenue Code of 1986, 55 Fed. Reg. 6764, 6764 (Feb. 26, 1990) ("[Sections 48(g) and 170(h)] require certifications from the

Secretary of the Interior in order for taxpayers to receive tax benefits. This rule establishes procedures whereby taxpayers apply for these certifications.").

III.    *Analysis*

   A.    *Certified Historic Structure*

Although we have previously encountered section 170(h)(4)(C), *see Gorra v. Commissioner*, T.C. Memo. 2013-254; *Herman v. Commissioner*, T.C. Memo. 2009-205, neither case presented the occasion to analyze the requirements of this conservation purpose. We do so now and conclude that the undisputed facts establish that the Building did not meet either definition of "certified historic structure" under section 170(h)(4)(C).

   1.    *Listed in National Register*

The first of these definitions provides that "any building, structure, or land area which is listed in the National Register" constitutes a "certified historic structure." I.R.C. § 170(h)(4)(C)(i). The Keeper of the National Register has unequivocally stated in a sworn declaration that the Building "is not individually listed in the National Register" and that NPS "has no record of the . . . Building ever being individually listed in the National Register."

CPII nonetheless asserts that a genuine issue of material fact exists as to whether the Building was in fact listed. CPII contends that the phrase "listed in the National Register" should be read to include anything and everything within the boundaries of a National Register listing, based on a hodgepodge of documents from two Keepers of the National Register, the South Carolina State Historic Preservation Office, and the Federal Energy Regulatory Commission. Under CPII's interpretation, the Building was "listed in the National Register" because it was within the boundaries of a historic district listed in the National Register.

We first note that CPII is dressing up a legal challenge in fact clothing in an attempt to sidestep summary judgment. The pertinent facts are undisputed: The Building is not itself listed in the National Register, but the district in which it is located is so listed. The dispute thus is not factual, but interpretive and amenable for resolution at this stage.

To resolve the question before us, we pick up the trusty tools of statutory interpretation, beginning "where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024). "[W]e must 'give effect, if possible, to every clause and word of [the] statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

"It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The term "listed" is not defined in the statute, so we give the term its ordinary meaning at the time of the enactment of section 170(h)(4). A contemporaneous dictionary defines the verb "list" as "1. To make a list of; itemize. 2. To enter in a list; register or catalogue." *List*, *American Heritage Dictionary of the English Language* (1st ed. 1969). We struggle to see how the Building can be "listed" where it plainly has not been entered into the relevant list, i.e., the National Register.

Although CPII's argument asks us to interpret "listed" to include "resources within the boundaries of a listed properties," the broader statutory context blocks this reading. Section 170(h)(4)(C)(i) provides that a "certified historic structure" includes "any building, structure, or land area which is listed in the National Register," while, under clause (ii), the term includes "any building which is located in a registered historic district (as defined in section 47(c)(3)(B)) and is certified by the Secretary of the Interior to the Secretary as being of historic significance to the district." If a building is necessarily "listed in the National Register" simply by being within the boundaries of a property listed in the National Register, such as a registered historic district, then section 170(h)(4)(C)(ii) has been rendered superfluous. *See, e.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (finding that statutes should be read "so as to avoid rendering superfluous any parts thereof").[6]

---

[6] The current version of these regulations casts additional doubt on CPII's broad view of listing, providing that even in the case of an individually listed property

Interior's regulations are further revealing both as to the meaning of "listed" in the late 1970s and as to the established regulatory backdrop to Congress's decision to recycle precisely the same terminology in 1980. In 1977 Interior promulgated regulations in response to identical terms ("listed in the National Register") and a nearly identical statutory scheme, i.e., offering definitions of a "certified historic structure" in a specific context. These regulations advised owners to "consult the listing of National Register properties in the Federal Register (found in most large libraries)" "[t]o determine whether or not a property is individually listed," 36 C.F.R. § 67.4 (1978), a practice it continues today, *see* 36 C.F.R. § 67.4(b) (2011). This direction makes sense only if one could actually find the relevant property in a published list. Likewise, the regulatory provisions governing notice and publication of nominations (triggering a public comment period) and notice and publication of listings would serve little function under CPII's reading. *See* 36 C.F.R. § 1202.13 (1980); 36 C.F.R. § 60.13 (1976). Of course, we presume Congress was aware of this existing listing and certification regime when it decided to repeat the same wording in section 170(h)(4)(C), and that it did so embracing the interpretation of "listed in the National Register" that allows the regulatory regime to function properly. *See, e.g., Hall v. United States*, 566 U.S. 506, 516 (2012) ("We assume that Congress is aware of existing law when it passes legislation." (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990))); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978).

In summary, the text and context of section 170(h)(4)(C)(i) establishes that the phrase "listed in the National Register" refers to a building, structure, or land area individually listed in the National Register and not merely one located in a registered historic district.[7]

---

with more than one building, "the owner must submit a single part 1 application," and the Secretary of the Interior will "determin[e] which of the buildings included within the listing are of historic significance to the property." 36 C.F.R. § 67.4(d)(2) (2011).

[7] CPII's authorities are not relevant to our interpretation. None of these authorities addresses section 170(h)(4)(C)(i) much less suggests that its general observations about listing govern the specific context.

### 2.    *Certification of Historic Significance*

The second definition encompasses "any building which is located in a registered historic district (as defined in section 47(c)(3)(B)) and is certified by the Secretary of the Interior to the Secretary as being *of historic significance* to the district." I.R.C. § 170(h)(4)(C)(ii) (emphasis added). The undisputed facts before us conclusively establish that CPII made no written application to the Secretary of the Interior to certify to the Secretary of the Treasury the Building's "historic significance" to the district, *see* 36 C.F.R. § 67.4(c) (2011), and that, accordingly, no such certification was made, a point confirmed by the Keeper of the National Register in her sworn declaration.

CPII responds that the acceptance of a building as a resource "contributing to" the historic district counts as a certification by the Secretary of the Interior of the Building's "historic significance to the district" for purposes of section 170(h)(4)(C)(ii). We disagree. In 1976 Congress offered tax benefits to buildings located in a registered historic district that were certified by the Secretary of the Interior to the Secretary of the Treasury as having historic significance to the district. In 1977 Interior explained how to obtain such a certification, requiring a written application and use of a particular form. Congress recycled the same certification element three years later, and we see no indication that it wished to disturb or deviate from the certification regime and requirements that Interior had established. We assume that in some circumstances a building might conceivably qualify for a certification of "historic significance" because it is a resource "contributing to" a registered historic district, but CPII plainly did not obtain such a "historic significance" certification for the Building, which is fatal to CPII's claim.[8]

### 3.    *Conclusion*

CPII fails to establish that the Building satisfies the definitions of "certified historic structure" enshrined in section 170(h)(4)(C). Consequently, the preservation of the Building does not count as a conservation purpose that can support a charitable contribution deduction of a partial interest in property.

---

[8] CPII makes a half-hearted argument that 36 C.F.R. § 67.4 does not apply to section 170(h)(4)(C)(ii) given certain revisions in 2011. The 2011 preamble firmly refutes that point and makes clear that any changes were technical, not substantive.

B.     *Alternative Argument*

CPII argues, in the alternative, that even if the Building does not constitute a "certified historic structure," the easement deed nonetheless contains a valid conservation purpose in that its restrictions protect a "historically important land area" under section 170(h)(4)(A)(iv). Generally, we consider only those purposes stated in an easement deed when determining whether an easement is "exclusively for conservation purposes." *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *30; *Murphy v. Commissioner*, T.C. Memo. 2023-72, at *42–43. This approach comports with the rule of construction under governing state law (South Carolina) that "[t]he intention of the grantor [of the easement] must be found within the four corners of the deed." *Windham v. Riddle*, 672 S.E.2d 578, 583 (S.C. 2009) (quoting *Gardner v. Mozingo*, 358 S.E.2d 390, 392 (S.C. 1987)).

It is also consistent with the centrality of conservation purpose in the statutory regime: Congress grants a tax deduction to a property owner that enters into an enforceable contract with a qualifying charitable organization to relinquish certain property rights in exchange for a binding commitment from the organization that it will protect a specified conservation purpose—including against the property owner—forever. *Murphy*, T.C. Memo. 2023-72, at *42. Defining with precision the conservation purpose is a crucial element for both of the contracting parties, establishing for the owner the scope of the rights being relinquished and for the charity what it has sworn to safeguard. One party cannot change the bargain that was struck (by, for example, unilaterally modifying an agreed-upon conservation purpose) to suit its own benefit. *Accord Turner v. Commissioner*, 126 T.C. 299, 311 (2006) ("A restriction granted in perpetuity on the use of the property must be based upon *legally enforceable restrictions* (such as by recording the deed) *that will prevent uses of the retained interest in the property that are inconsistent with the conservation purpose of the contribution.*" (Emphasis added.)); *see also* Treas. Reg. § 1.170A-14(g)(1).

CPII argues that a factual question remains as to the parties' intent that precludes summary judgment. The easement deed here leaves no doubt as to its purpose:

> The purposes of the Easement and this Agreement are to assure that the Building Façade will be retained and maintained forever in its rehabilitated condition and state exclusively for conservation and preservation purposes, for

> the scenic, cultural and historic enjoyment of the general public, and to prevent any use or change of the Building Façade  or the air space on the Property directly above or adjacent to the Building that is inconsistent with the historical character of the Building Façade.

The deed highlights its limited scope in its very next section, stating "[t]he grant of the Easement is specifically limited to the Building Façade and the Development Rights, and the Grantee shall not be deemed to possess any easement over or right in any other portion of the Property except as specifically set forth in this Agreement." On its face, the easement deed preserves a building, not a historically important land area.

CPII parries that preservation of the Building counts as preservation of a historically important land area. It reaches this counterintuitive conclusion on the basis of Treasury Regulation § 1.170A-14(d)(5)(ii)(B), which provides that a historically important land area can include "[a]ny land area within a registered historic district including any buildings on the land area that can reasonably be considered as contributing to the significance of the district." In attempting to apply this regulation CPII misreads section 170(h)(4)(A)(iv) in an effort to avoid the requirements of section 170(h)(4)(C). To satisfy the conservation purpose of protecting a historically important land area, there must be a land area that is protected. *See Turner*, 126 T.C. at 314–17. A single façade easement protecting a single building is insufficient.

Moreover CPII's interpretation runs afoul of the rule of statutory construction that "the specific terms of a statutory scheme govern the general ones." *D.B. v. Cardall*, 826 F.3d 721, 735 (4th Cir. 2016). "The general-specific rule is particularly applicable where 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *Id.* (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Congress here established both "historically important land areas" and "certified historic structures" as qualifying conservation purposes but went on to add detailed definitions for the latter. CPII's expansive reading of "historically important land area" would swallow the more specific definition of "certified historic structure" and thus is to be avoided. *See RadLAX*, 566 U.S. at 645 (noting that the canon has "full application . . . to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side," avoiding "the superfluity of a

specific provision that is swallowed by the general one"). In short, "[t]he terms of the specific authorization must be complied with," *id.*, and CPII's attempted end-run falls short of the goal line.

IV.     *Conclusion*

CPII fails to establish that the easement protects any conservation purpose recognized in section 170(h)(4). We accordingly conclude that it has failed to satisfy the necessary requirements to claim a charitable contribution deduction for the donation at issue.

To reflect the foregoing,

*An appropriate order will be issued.*