**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12128

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

RUFINO ROBELO-GALO,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:11-cr-00023-MW-GRJ-1

————————————

Before NEWSOM, BRASHER, and TJOFLAT, Circuit Judges.

BRASHER, Circuit Judge:

This appeal raises a question of first impression: what does it mean for an inmate to be the "only available caregiver" for a family member under United States Sentencing Guidelines § 1B1.13(b)(3)(C)? Federal prisoner Rufino Robelo-Galo petitioned

for compassionate release under 18 U.S.C. § 3582, arguing that he was the "only available caregiver" for his incapacitated father. The district court determined that Robelo-Galo's son, Elmer, was an available caregiver, and, as a result, that Robelo-Galo was not the *only* available caregiver. The court denied the petition, and Robelo-Galo appealed.

We now hold that to establish eligibility for release under section 1B1.13(b)(3)(C) an inmate must demonstrate that no other person is *qualified* and *free* to provide the needed care. Whether an alternative caregiver is both qualified and free will turn on the unique facts of a particular case, but we identify several factors that district courts should consider in making that assessment. And, applying that standard here, we conclude that the district court reasonably weighed and considered the relevant factors in determining that Robelo-Galo is not the "only available caregiver" for his father. Accordingly, we affirm the denial of Robelo-Galo's petition for compassionate release.

## I.

Robelo-Galo pleaded guilty to two charges related to drug trafficking. The district court initially imposed a 354-month sentence, but following a retroactive amendment to the Guidelines, it reduced Robelo-Galo's sentence to 296 months. Robelo-Galo's current release date is May 15, 2033.

Robelo-Galo is originally from Honduras, and his father still lives there. In the years since Robelo-Galo's arrest and imprisonment, his father's physical condition has substantially declined,

rendering him bedridden. As a result, his father is incapable of self-care, and he relies on a caregiver for survival. Until recently, Robelo-Galo's former romantic partner, Reyna Gutierrez, served as Robelo-Galo's father's caregiver. But because of her own deteriorating health, Gutierrez is no longer able to provide Robelo-Galo's father with the full-time care that he needs.

In 2024, Robelo-Galo filed a petition for compassionate release. Under the Guidelines, a prisoner may be eligible for compassionate release when an "extraordinary and compelling" circumstance justifies his early release. The 2023 Guidelines amendments expanded the list of "extraordinary and compelling" circumstances to include "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C). Seizing on that amendment, Robelo-Galo claimed that he was the only available caregiver for his father, qualifying him for a sentence reduction.

The United States opposed Robelo-Galo's motion. The government argued that Robelo-Galo failed to establish that he was the *only* available caregiver because he did not address why no other family members (including any of Robelo-Galo's five children), non-related caregivers, or government-provided assistance could meet his father's needs.

The district court agreed with the government and denied Robelo-Galo's motion. However, in its ruling, the district court granted Robelo-Galo leave to refile his motion "[i]n the event [that

he] can demonstrate that his children are unable to care for his fa-ther . . . ." Doc. 784 at 2.

Robelo-Galo did just that: He filed a renewed motion for compassionate release, arguing that none of his five children were available to serve as their grandfather's caregiver. Specifically, Robelo-Galo asserted that one child was deceased; one's whereabouts were unknown; two lived in the United States and could not relocate to Honduras; and the remaining child, Elmer, lived in Honduras but four hours away. Robelo-Galo further explained that Elmer could not travel back and forth to care for his grandfather because he did not have a car, that Elmer could not accommodate his grandfather in his own home because of space constraints, and that Elmer could not relocate to his grandfather's home because he would not be able to find work and provide for his own children.

The district court denied Robelo-Galo's renewed motion. The district court reasoned that, because Elmer was "within hours of the incapacitated family member," Robelo-Galo was not "the only available caregiver for his incapacitated father." Order Den. Mot. for Compassionate Release at 2. It added that "a finding of compassionate release cannot rest solely on avoiding such inconvenience for a convicted inmate's family." *Id.*

Robelo-Galo appealed.

## II.

This appeal presents two issues. First, we must consider what it means to be the "only available caregiver" under the

Guidelines. Second, we must determine whether the district court erred by finding that Elmer is an "available caregiver" such that Robelo-Galo is not the "only available caregiver."

*A.*

The first question—what it means to be the "only available caregiver" under the Guidelines—is a question of law that we review *de novo*. *United States v. Warren*, 820 F.3d 406, 407 (11th Cir. 2016). On *de novo* review, "[w]e utilize traditional rules of statutory construction to interpret [the] guideline." *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004).

This is a question of first impression. No case law from the Supreme Court, our circuit, or any other circuit defines "available caregiver" under U.S.S.G. § 1B1.13(b)(3)(C). Applying the "traditional rules of statutory construction," *Mandhai*, 375 F.3d at 1247, then, we look to the usual sources to determine the phrase's ordinary meaning—dictionaries, context, and canons of interpretation, among others. *PETA v. Miami Seaquarium*, 879 F.3d 1142, 1146–47 (11th Cir. 2018). We will start with an analysis of the parties' competing interpretations and then identify a non-exhaustive list of factors for district courts to consider.

1.

We turn first to the parties' competing interpretations of "only available caregiver." Both parties agree that it isn't enough for an inmate to establish that he is *an* available caregiver for a relative; he must instead exclude likely alternatives and be the "only

available caregiver." It follows, Robelo-Galo argues, that a district court should decide whether an alternative caregiver is "available" on a case-by-case basis, focusing on the practical realities of providing care. He contends that the focus should be on an alternative caregiver's capacity to provide care and his willingness to do so. The government disagrees. It argues that any potential caregiver who is not himself "incapacitated" is necessarily "available."

We think that Robelo-Galo has the better position, and, in fact, the government conceded as much at oral argument. To support its argument, the government relied upon U.S.S.G. § 1B1.13(b)(3)(A), which provides that the "incapacitation of the caregiver of the defendant's minor child" constitutes an "extraordinary and compelling reason" that may justify a sentence reduction. But the plain text of section 1B1.13(b)(3)(C) counsels against an incapacitation-based definition of "available caregiver." The Sentencing Commission used "incapacitation of the caregiver" when describing the caregiver of a defendant's minor child in (b)(3)(A) but used "available caregiver" when describing the caregiver of a defendant's spouse or parent in (b)(3)(B) and (b)(3)(C). *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[A] material variation in terms suggests a variation in meaning[.]"). Moreover, the government's interpretation would lead to absurd results—requiring the inmate to be the only not-incapacitated person who could theoretically provide care would mean that, as long as a single healthy person existed, no inmate could meet the standard. The government wisely dropped this position at oral argument.

Like Robelo-Galo, we believe a practical, fact-dependent definition of "available caregiver" is most consistent with the term's plain meaning. We conclude that, to prove that he is the "only available caregiver," an inmate must establish that no other likely caregiver is both (1) qualified and (2) free to provide care. An alternative caregiver is *qualified* if he has the capacity to provide the incapacitated person with the care that the person needs. An alternative caregiver is *free* if no material constraint prevents him from providing care. Whether an alternative caregiver is both qualified and free is a fact question that necessarily turns on the circumstances of a particular case.

We think this understanding of "available caregiver" is the best reading of the term for three reasons.

First, this practical inquiry comports with the dictionary definition of "available." The term "available," when referring to a candidate, means "qualified or willing to do something or to assume a responsibility." *Available*, Merriam-Webster's Collegiate Dictionary (11th ed. 2022). And when referring to a person generally, the term means "not otherwise occupied; free to do something." *Available*, Oxford English Dictionary (3d ed. 2025). Our standard—which requires the caregiver to be both qualified and free—aligns with the ordinary understanding of the word "available."

Second, this practical case-by-case standard is consistent with analogous caselaw. As Robelo-Galo points out, in *D.B. v. Cardall*, the Fourth Circuit interpreted "available" in the context of the

unaccompanied alien statute, which asks whether a parent is "available to provide care and physical custody," a formulation synonymous with "available caregiver." 826 F.3d 721, 734 (4th Cir. 2016) (citing 6 U.S.C. § 279(g)(2)(C)(ii)). There, the Fourth Circuit held that a mother was unavailable because a home study revealed that she was "incapable of providing for [her child's] physical and mental well-being." *Id*. at 734. In reaching that conclusion, the Fourth Circuit treated "availability" as a practical inquiry into whether the parent could provide care. Although *D.B.* did not address the guidelines, the Fourth Circuit's practical understanding of "available to provide care" is analogous to our understanding of the very similar "available caregiver."

Third, this definition makes sense when we consider the purpose of the Sentencing Commission's Policy Statement. Of course, purpose "cannot be used to contradict the text or to supplement it." Scalia & Garner, *supra*, at 57. But it may be used as "a constituent of meaning," and it is often "helpful in understanding the ordinary, contemporary, common meaning" of the policy's language. *United States v. Bryant*, 996 F.3d 1243, 1257 (11th Cir. 2021). That is the case here.

Section 1B1.13(b)(3) is not concerned with alleviating the burdens of imprisonment on the inmate, but with preventing an inmate's family members from being left without care during the inmate's incarceration. In other words, section 1B1.13(b)(3) operates as a policy of last resort: It authorizes a sentence reduction only when no other realistic caregiving option exists. The health of the

family member, not the wishes of the inmate or other potential caregivers, forms the relevant "extraordinary and compelling" justification for the inmate's release. When an inmate's family member needs a caregiver, we should expect that another person who is qualified and free to provide care will take on the role, instead of releasing the inmate.

2.

We recognize that, as with any fact-intensive inquiry, the question whether an alternative caregiver is "available" may require a factfinder to consider and weigh competing factors. To that end, we offer the following non-exhaustive list of factors that district courts should consider in determining whether a potential caregiver is qualified and free. *Cf. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.").

First, a district court should consider whether legal barriers prevent the potential caregiver from providing care. For example, a potential caregiver's immigration status can affect whether he can lawfully remain in the country where the incapacitated family member resides. Likewise, there may be other legal obligations—such as enlistment in the military—that make an alternative caregiver not free to provide care.

Second, a district court should consider physical or logistical barriers to caregiving. Geographic distance may render caregiving impracticable depending on the circumstances. A potential

caregiver who lives across the country is less free to care for an incapacitated relative than a potential caregiver who lives in a neighboring town. We do not adopt a bright-line geographical rule. Instead, the factfinder should consider the feasibility and burdens of relocation (both the caregiver relocating to the relative and vice versa) in assessing whether an alternative caregiver is free to provide the necessary care.

Third, a district court should consider whether knowledge- or capability-based barriers affect the caregiver's qualifications. A potential caregiver who does not speak the incapacitated person's language, for example, may lack the ability to provide them with effective care. Similarly, a potential caregiver that would need to learn specialized medical skills may not be qualified.

Fourth, a district court should consider any familial dynamics or relationship history that may bear on an alternative caregiver's availability. A history of abuse may undermine a potential caregiver's capacity to provide appropriate care. Likewise, a longstanding pattern of estrangement or absence may weigh against a finding that a potential caregiver is free to provide care. By contrast, evidence that a family member or friend has previously cared for the incapacitated person supports a finding that the family member or friend is available.

Fifth, a district court should consider any economic, financial, or employment-related barriers that would impact a caregiver's availability. Although alternative caregivers may not be expected to surmount unusual or extraordinary obstacles, a caregiver

is not unavailable merely because providing care would require balancing caregiving with other obligations. In weighing these kinds of constraints, a district court should consider whether the alternative caregiver's constraints or burdens are meaningfully different or greater than those that the inmate would face if released to provide care.

### B.

We now ask whether the district court erred in determining that Robelo-Galo is not the "only available caregiver" for his father because Elmer is also "available" to provide care. This is a "quintessential mixed question of law and fact." *Wilkinson v. Garland*, 601 U.S. 209, 212 (2024). But because the inquiry primarily turns on "case-specific factual issues" and compels the district court "to marshal and weigh evidence," we review it for clear error. *Id.* at 222 (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)). We will find clear error only when, "although there is evidence to support" the conclusion, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

We cannot say that the district court clearly erred in finding that Elmer is an available caregiver. In its analysis, the district court discussed many of the relevant factors we have outlined above and found that Elmer is both qualified and free to provide care. There is no dispute that Elmer is qualified to provide the kind of care that Robelo-Galo's father needs. The district court also found that

Elmer is a "close family member" of his incapacitated grandfather, lives within reasonable proximity to him, and faces no material burdens beyond "the ordinary constraints of . . . daily li[fe]" that would impede his freedom to serve as a caregiver. Doc. 788 at 2. We cannot say that any of these underlying fact-findings are clearly erroneous.

Although Robelo-Galo argues that Elmer is unavailable because he needs to work and he lives hours away from and his grandfather's current residence, we cannot say that these circumstances render him not free to provide care. We agree with the district court that the ordinary burdens of caregiving, without more, are insufficient to establish unavailability. And we note that Robelo-Galo would face many of the same constraints that he claims render Elmer unavailable. Like Elmer, Robelo-Galo, if released to serve as his father's caregiver, would need to relocate and find employment. The contention that these circumstances disqualify Elmer as an available caregiver but would not similarly constrain Robelo-Galo reinforces the conclusion that the asserted barriers reflect ordinary caregiving burdens rather than legally relevant obstacles.

In sum, the district court reasonably determined that Elmer is available to care for Robelo-Galo's father. Even if another district court could have weighed these facts differently, we are not "left with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395. Accordingly, we cannot

say that the district court committed clear error in finding that Robelo-Galo is not the "only available caregiver" for his father.

## III.

The district court is **AFFIRMED**.